# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT FLORIDA
## ORLANDO DIVISION

DIAMOND RESORTS INTERNATIONAL, INC.,
DIAMOND RESORTS U.S. COLLECTION
DEVELOPMENT, LLC, DIAMOND RESORTS
HAWAII COLLECTION DEVELOPMENT, LLC,
and DIAMOND RESORTS MANAGEMENT, INC.,

       Plaintiffs,

vs.                                   Case No.: 6:17-cv-1394-RBD-DCI

AUSTIN N. AARONSON, individually,
and AARONSON, AUSTIN, PA.

       Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, AUSTIN N. AARONSON and AARONSON, AUSTIN, PA (collectively "Defendants" or "Mr. Aaronson"), by and through their undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, hereby file their Motion For Summary Judgment and state:

## INTRODUCTION AND MATERIAL FACTS

When a person agrees to buy a timeshare, they typically, on average, incur a debt of approximately $22,000 that accrues interest at 12% to 18% over the life of a 10 year loan often resulting in nearly $40,000 worth of payments. [2018 Timeshare Industry Report, Exh A pg. 16]. Additionally, timeshare owners incur annual maintenance fees of approximately $1000 per year that increase regularly. [Exh A pg. 22].The high cost of ownership coupled with feelings of being deceived cause many timeshare owners to become disaffected.

In 2013, Orlando, Florida attorney, Austin Aaronson began representing these disaffected timeshare owners in their efforts to end their purported timeshare obligations relationships. To attract new clients, Mr. Aaronson developed certain advertisements which he posted on his law

firm's website. To date, at least 282 Diamond timeshare owners have retained Mr. Aaronson (Mr. Aaronson's Diamond clients). [Wolf Dep, Exh. B 42:4-18][1]. 162 (57%) of Mr. Aaronson's Diamond clients are presently current on their obligations to Diamond. Fifty five of his clients initiated arbitration proceeding against Diamond alleging various claims including breach of fiduciary duty, accounting, fraud in the inducement, violation of Nevada statute §41.600, conversion, quantum meruit, and rescission. [*See e.g.*, Sorenson Award, Exh C ¶ 3]. At least thirteen of the arbitration cases settled before awards were issued. Two of the arbitration cases resulted in favorable awards for Mr. Aaronson's clients. [Exh C; Luk Award, Exh D]. The remaining arbitrations resulted in awards that were unfavorable or neutral to Mr. Aaronson's clients. In five of these unsuccessful arbitrations, the arbitrator found that some of the claims were asserted in bad faith.[2] [Bad Faith Arbitration Awards, Exh. E]. In the remaining arbitration proceedings, the arbitrators found that the claims were brought in good faith. [Good Faith Arbitration Awards, Exh. F].

Most, if not all, of Mr. Aaronson's Diamond clients disliked Diamond's business and sales tactics *before* they ever sought out Mr. Aaronson for help. [*See e.g.*, Spreadsheet Excerpts, Exh. G]. A great many felt like Diamond had lied to them and that timeshare payments were simply a colossal waste of money. [Exh. G].

Diamond claims that several statements in Mr. Aaronson's advertisements are false or misleading. Plaintiffs point to these statements in their Amended Complaint, [Doc. 47], their Responses to Defendants' First Set of Interrogatories. [Diamond's Response to Interrogatories, Exh

---

[1]Mr. Wolf is Diamond's retained expert on damages.
[2]Contained in most, if not all, of Diamond's timeshare purchase agreements, is an arbitration provision that requires all claims to be resolved by binding arbitration. [*See e.g.*, Hardisty purchase agreement, Exh AA ¶ 17(a)-(i)]. The

H pg. 6] and certain exhibits to Plaintiff's Marketing Survey Report [Exhibit 3 to Survey Report, Exh. I; Exhibit 4 to Survey Report, Exh. J; Exhibit 5 to Survey Report, Exh. K].[3] The allegedly false or misleading statements are:

(1) "it is *commonplace* for [timeshare] developers to use fraudulent tactics to obtain signatures on timeshare contracts." [Doc. 47 ¶ 2].
(2) "But that's not to say that you don't have any leverage, any cards to play" [Doc. 47 ¶ 30; Exh. I].
(3) "this is where your leverage is" [Doc. 47 ¶ 30; Exh. I].
(4) "Your Developer has a fiduciary duty to manage the resorts in your best interest. Chances are, they're in breach of that duty, in ways that are very obvious and easy to prove. This is where the developer is most vulnerable. This is where your leverage is." [Doc. 47 ¶¶ 29, 30; Exh. J].
(5) "chances are good that your timeshare developer is exposed legally in ways that are relatively straightforward and provable" [Doc. 47 ¶¶ 27; Exh. K].
(6) "Quite often, one's signature on a timeshare contract is obtained by fraud." [Doc. 47 ¶¶ 2, 30, Exh. I].

Diamond claims that these statements caused them damages in the form of impairment of reputation and goodwill, lost profits, loss of custom, unpaid promissory note obligations, unpaid maintenance and club fees, and various costs and attorney fees associated with the arbitration proceedings. [Doc. 47 ¶¶ 63, 68(E), 76(B), & 83].

## PROCEDURAL HISTORY

On February 8, 2018, Plaintiffs filed the operative Amended Complaint, [Doc. 47] accusing Defendants of (1) False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I)

---

arbitration provisions require Diamond to "bear all fees of the Administrator or arbitrator" if the claims are brought in good faith. [*Id.* at ¶ 17(d)].

[3] When Defendants asked Diamond to specifically identify all of Mr. Aaronson's allegedly false or misleading advertisements, Diamond made a general reference to Mr. Aaronson's entire website and their own Amended Complaint. [Exh H pg. 6]. Diamond never amended their response to RFP #6. Consequently, Diamond is now limited to the advertisements referenced in their Amended Complaint as articulated in their Survey Report. Diamond has the burden of identifying which of Mr. Aaronson's advertisements are allegedly false or misleading and it is not the responsibility of the Defendants or the Court to guess which advertisements the Plaintiffs take issue with. *See Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1349 (M.D. Fla. Feb. 28, 2006) ("[Defendants] counterclaim is based solely on alleged false or misleading representations on plaintiffs' website and in promotional materials plaintiffs

[Doc. 47 ¶¶ 56-68]; (2) Tortious Interference with Contractual Relationships (Count II [Doc. 47 ¶¶ 69-76]; (3) Trade Libel (Count III) [Doc. 47 ¶¶ 77-83]; (4) violation of Florida Deceptive Unfair Trade Practices Act (Count IV) [Doc. 47 ¶¶ 84-89]. On February 22, 2018 Defendants filed their Answer and Affirmative Defenses to the Amended Complaint. [Doc. 51]. Diamond retained an expert to prepare Consumer Survey Report (Survey Report). Diamond retained an expert to prepare a Damages Report. (Damages Report). Discovery closed on October 19, 2018. Defendants now move for summary judgment on all counts.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bentley Motors Corp. v. McEntegart*, 976 F. Supp. 2d 1297, 1309 (M.D. Fla. Sept. 30, 2013) (quoting Fed. R. Civ. P. 56(a). "A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment." *Id.* at 1309.

"An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "A fact is material if it may affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Id.* "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.*

---

disbursed at a 2003 trade show. Thus, the alleged oral statement … raised for the first time in opposition to summary judgment cannot now serve as a basis to avoid summary judgment.")

**ARGUMENT**

## I.   COUNT I – FALSE OR MISLEADING ADVERTISING UNDER THE LANHAM ACT

### a.  Diamond Lacks Statutory Standing

15 U.S.C. §1125 "authorizes suit by any person who believes that he or she is likely to be damaged by a defendant's false advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citing §1125(a)(1)) (internal citations omitted). "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 140. "[A] statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 129. This standard is "not especially demanding," but "forecloses suit … when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* at 130. The zone of protected interests is limited to "**injuries to business reputation and present and future sales.**" *Id.* at 131 (emphasis added). "Section 1125(a) only protects "**injury flowing directly from the deception** wrought by the defendant's advertising; and that **that occurs when deception of consumers causes them to withhold trade from the plaintiff.**" *Id.* at 133-34 (emphasis added). The proximate causation requirement "reflects the reality that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Id.* at 132 (citation omitted).

### i.   The Congress Did Not Intend for the Lanham Act to Be Used by Diamond to Seek Redress For the Injuries They Have Claimed

The Defendants initially raised a statutory standing argument in their Motion to Dismiss the Complaint relying on the *Lexmark* rubric. [Doc. 21 pgs. 8-10]. The Court rejected the

Defendants argument observing that the Plaintiffs alleged "**loss of sales and market share and reputational damage** …" *Id.* (emphasis added)]. The true extent of Plaintiffs' claimed injuries are now clearly defined and matter is now ripe for proper consideration.

Diamond has expressly abandoned all goodwill or reputational claims. [Doc. 93 pg. 6 ("**Diamond is not seeking damages in this case for loss of goodwill or diminution of their reputation** ….") (emphasis in original)]. Second, Diamond has abandoned any claim to lost sales and market share by refusing to allow discovery of any information that would allow Defendants an opportunity to quantify or dispute such claims.[4] [*See e.g.,* Pl's Response to RFP, Exh. L pg. 12];[5] *cf. Romero v. Drummond Co.*, 552 F.3d 1303, 1321-22 (11th Cir. 2008) (finding no abuse of discretion in refusing to allow evidence that would result in "exceptional prejudice to the defendant of trying to get testimony of a witness about whom they have had no opportunity to do any discovery at all."). Further, Diamond's Survey Report makes no reference to lost sales. [Survey Report, Exh. M]. The non-payment of promissory notes does not constitute a loss of sales. Indeed, Diamond's own accounting department does not classify consumer promissory note payments as "sales". [Diamond Form 10-K Dec. 31, 2015, Exh N pg. F-21].[6]

---

[4]Diamond has effectively dropped these damages because they apparently have not incurred any such damages. *See Second Quarter 2016 Highlights*, available at https://www.businesswire.com/news/home/20160808005636/en/Diamond-Resorts-International-Reports-Quarter-2016-Financial.

[5]In response to Defendants Request # 21 for "financial statements", Diamond did not produce any financial statements. In response to Defendants Request # 22 for balance sheets, profit and loss statements, statements of cash flow, listings of debt …", Plaintiffs objected describing such discovery as "improper and harassing." In response to Defendants Request # 33 for documents supporting claimed damages, Plaintiffs did not produce any documents to support a claim for lost sales or lost profits or lost market share.

[6]Diamond's 10-K for 2015 routinely refers to "sales" as the sale of vacation ownership interests (VOI) commonly known as "points." [Exh. N pg 5].Whereas when Diamond refers to the future revenue streams from payments made on promissory notes by timeshare owners, they refer to such as "receivables." [Exh N pg F-21]. Any attempt by Diamond to now argue that payments on consumer promissory notes and fees are properly classified as sales would be inconsistent with their own accounting practices and would probably run afoul of widely accepted accounting practices.

Diamond's "ability to compete" in the marketplace has not diminished. Diamond has not shown that its top or bottom line has been affected. Diamond has not lost market share to any of its direct or indirect competitors. *See Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1168 (11th Cir. 2007) (observing that anomalous decreases in sales are "the type of harm the Lanham Act was intended to redress"); *Trump Plaza of the Palm Beaches Condo. Ass'n v. Rosenthal*, No. 08-80408, 2009 U.S. Dist. LEXIS 54450, at *16-*17 (S.D. Fla. Jun. 24, 2009) (citing *Phoenix* at 1167-68). (observing that a diminished "ability to compete" is actionable under the Lanham Act).[7] Diamond has not shown a loss of customers. *See Id.* (observing that "unnatural spikes" in competitor sales are "the type of harm the Lanham Act was intended to redress"). Diamond has not spent money to counteract the advertising. *See Id.* (observing that "promotional costs to "lure back customers" are "the type of harm the Lanham Act was intended to redress).

Thus the only damages that Diamond is presently pursuing are: (1) attorney fees and various arbitration costs, awards, and interest incurred during arbitration proceedings brought by Mr. Aaronson's Diamond timeshare clients; and (2) non-payment of promissory note payment of principal, interest, and fees, as well as timeshare "maintenance fees" and "club fees" and "other fees." [Damages Report, Exh. O pgs. 12-13, 24]. Diamond's commercial interests in accounts receivables and arbitration expenses fall well outside that zone because their claimed injuries are not "injuries to business reputation and present and future sales."

###### ii.      Mr. Aaronson's Advertisements Are Not the Proximate Cause of Diamond's Damages.

---

[7]Although *Phoenix* and *Trump Plaza* were decided before *Lexmark Int'l* and applied a statutory standing test that was different from the one later adopted in *Lexmark Int'l*, all three Courts considered congressional intent on the issue of damages to determine statutory standing.

Under the second *Lexmark Int'l* prong, a plaintiff "ordinarily must show economic or reputational injury flowing **directly** from the deception wrought by the defendant's advertising." *Lexmark*, 572 U.S. at 133. In order to bridge the divide between Mr. Aaronson's advertising and Diamond's claimed damages necessarily requires numerous intervening steps that break causation.

Nowhere in any of the subject statements is there any language that actually directs (or even implies) readers to stop making payments to Diamond or initiate any sort of legal action. The Plaintiffs have claimed sum-certain damages that relate to specific and identifiable individuals (i.e., Mr. Aaronson's Diamond clients). For the vast majority of these clients, Diamond has absolutely no idea whether or not any of them ever actually saw the subject advertising.[8] And there is no evidence even showing that Mr. Aaronson's Diamond clients were prompted to discontinue payments or initiate sham arbitrations based solely on the subject advertising. Many intervening steps would have had to occur—the clients would have had to first retain Mr. Aaronson who would have had to analyze the case and determine whether it was a good candidate for arbitration (most are not). Then the arbitration itself would have had to occur and, finally Diamond would have had to win.  This sequence of necessary and intervening events breaks the chain of causation. *The UPS Store, Inc. v. Hagan*, No. 14-cv-1210, 2017 U.S. Dist. LEXIS 121352, at *23 (S.D.N.Y. Aug. 2, 2017) ("[plaintiffs] still cannot point to any evidence that they lost business <u>because any Defendant misrepresented the Ground Guarantee</u>. The Lanham Act imposes liability for injuries proximately caused by false advertising, not abusive treatment ….") (emphasis in original).

Relatedly, Defendants moved dismiss Plaintiffs' false advertising claim on the grounds that the challenged advertisements were not commercial speech under the current Eleventh Circuit test because the Defendants and Plaintiffs are not marketplace competitors. [Doc. 43 pg. 6]. The Court

8

rejected Defendants' argument stating that "when a party claims reputational injury from disparagement, competition is not required for proximate cause" [*Id.* (citing *Lexmark Int'l*, 572 U.S. at 138)]. Since then the Plaintiffs' abandoned their claim for reputational damages. [Doc. 93 pg. 6]. Consequently, they must now show that they are marketplace competitors with Mr. Aaronson under commercial speech test espoused in *Tobinick v. Novella*, 848 F.3d 935, 950-51 (11th Cir. 2017).[9] Plaintiffs cannot do this. Consequently, under the authority of *Tobinick*, Diamond cannot, as a matter of law, establish standing on its false advertising claim.

### b.  Diamond Cannot Prove a False Advertising Claim

Addressing the merits of Count I, the Plaintiffs allege False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a). [Doc. 47 ¶¶ 56-68] Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), codified at 15 U.S.C. § 1125(a), provides, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
> …
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[8]Mr. Aaronson's Diamond clients' testimonial evidence is presented *infra*.

[9]If it is true that "when a party claims reputational injury from disparagement, competition is not required for proximate cause," then it does not necessarily follow that—when a party does *not* claim reputational injury from disparagement, competition is required for proximate cause. However, the latter is certainly an implied corollary of the former, and if the latter is not implied from the former, then the Supreme Court in *Lexmark Int'l* could have simply stated that competition is not required for proximate cause regardless of whether or not a party claims reputational damages. In other words, if, as is the case here, a party has no claim for reputational damages, the party must prove that it has a competitive relationship with the defendant in order to show proximate cause. *See Tobinick*, 848 F.3d at 256 (retaining the commercial competition prong); *but see Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. Appx. 251, 256-57 (4th Cir. 2017) (dropping competition prong from commercial speech test).

In order to prove that a defendant engaged in false advertising, a plaintiff must show: (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) actual or likely injuries resulted from the false advertising." *Gibson v. Resort at Paradise Lakes, LLC*, No. 8:16-cv-791, 2018 U.S. Dist. LEXIS 80471, at *37-*38 (M.D. Fla. Feb. 2, 2018).

### i. Mr. Aaronson's Advertisements Are Neither False Nor Misleading.

"The first element of a false advertising claim is satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (quoting *Johnson & Johnson*, 299 F.3d at 1247) (internal quotations omitted). "When determining whether an advertisement is literally false or misleading, courts must analyze the message conveyed in full context, and must view the face of the statement in its entirety . . . ." *Id.* (quoting *Johnson & Johnson*, 299 F.3d at 1248) (internal quotations omitted). "The ambiguity of the statement at issue, or the lack thereof is significant. Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false." *Id.* (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998)). "As the meaning of a statement becomes less clear, however, and it becomes susceptible to multiple meanings, the statement is more likely to be merely misleading." *Id.* (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)). "[S]tatements of opinion are generally not actionable." *Osmose,, LLC*, 612 F.3d at 1311, unless the statement "fairly implies a factual basis." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015).

Statements (1) and (6) are: it is commonplace for [timeshare] developers to use fraudulent tactics to obtain signatures on timeshare contracts," and; "Quite often, one's signature on a timeshare contract is obtained by fraud. Although there is no hard fast way to quantify how often an event must occur before it becomes "quite often" or "commonplace," the countless droves of Diamond timeshare owners, including many of Mr. Aaronson's clients, who routinely complain of Diamond's sales methods describing fraudulent activity, is sufficient evidence to show that this statement is neither false nor misleading. [Diamond Consumer Complaints, Exh. P]. *See generally Sirmon v. Wyndham Vacation Resorts, Inc.*, No. 7:10-cv-2717, 2012 U.S. Dist. LEXIS 132986 (N.D. Ala. Sept. 18, 2012 (discussing timeshare sales and business practices sounding in fraud and conspiracy). Moreover, the terms "commonplace" and "quite often" are qualitative modifiers that are not readily subject to empirical verification and consequently non-actionable under the Lanham Act. *See Global Tech LED, LLC v. Hilumz Int'l Corp.*, 2017 U.S. Dist. LEXIS 20512, at *16 (finding statements "be careful" of competitor, and competitor is "going out of business" are non-verifiable and consequently non-actionable).

Statements (2) and (3) are: "But that's not to say that you don't have any leverage, any cards to play," and "this is where your leverage is." These messages are opinions that do not imply any factual basis. When considering these statements in the context of the broader message, they suggest that some timeshare developers *may* be engaging in activities that violate their fiduciary duties, and *may* have conflicts of interests, and *may* be mishandling trust funds. [Exh. I, Exh J, Exh. K]. The equivocal nature of these statements renders them incapable of being literally false. *See Id.* at *16 (finding statements to be "non-verifiable prediction or opinion about the future of Hilumz, and consequently, is not actionable as a false or misleading statement of fact under the Lanham

11

Act."); The statements never actually mention Diamond; they apply generally to all of the developers in the industry and nothing in the advertisements would suggest that Diamond is being singling out. Moreover, at least some of Plaintiffs fellow developers, it would appear, *may* actually be engaging in the very sorts of activities that Mr. Aaronson described in connection to statements (2) and (3). *See e.g., RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-cv-01301, 2018 U.S. Dist. LEXIS 53174 (D. Colo. Mar 29, 2018) (permitting timeshare owner plaintiffs to proceed against timeshare developer on fraud claims and other claims associated with a breach of fiduciary duties); *Reiser v. Marriott Vacations Worldwide Corp.*, No. 2:16-cv-00237, 2018 U.S. Dist. LEXIS 96957 (E.D. Cal. Jun. 7, 2018) (same). In essence, Mr. Aaronson's statements are tantamount to saying: "if your timeshare developer is breaching its duty to you, you can leverage that by initiating legal proceeding against the developer." The statements does not imply that Mr. Aaronson has some special leverage that can be brought to bear against any timeshare developer including Diamond. In fact the statement specifically refers to "your leverage" not Mr. Aaronson's leverage. The fact that Mr. Aaronson follows these statements by stating: "and you owe it to yourself to hire experienced, competent counsel" suggests that disaffected timeshare owners should hire Mr. Aaronson to help properly apply their leverage through legal means with Mr. Aaronson's assistance.

Statements (4) and (5) are: "Your Developer has a fiduciary duty to manage the resorts in your best interest. Chances are, they're in breach of that duty, in ways that are very obvious and easy to prove," "chances are good that your timeshare developer is exposed legally in ways that are relatively straightforward and provable." What Mr. Aaronson considers to be a good chance is nothing more than his opinion and is subject to significant variation across the population. *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 303 (4th Cir. 2017) ("Whether a domain is a 'good'

12

domain is subjective to the registrant"). The statement that timeshare developers may be exposed in ways that are "straightforward" is similarly an opinion; what Mr. Aaronson considers to be straightforward is his subjective opinion and may not be consistent with the opinions of others and is consequently resistant to empirical verification and therefore not actionable under the Lanham Act. *See Global Tech*, 2017 U.S. Dist. LEXIS 20512, at \*16; *Schütz Container Sys., Inc. v. Mauser Corp.*, 2012 U.S. Dist. LEXIS 44012, at \*32 (N.D. Ga. Mar. 28, 2012) (granting summary judgment "because the statements reasonably are susceptible to this alternate interpretation, they are ambiguous …."). Mr. Aaronson claims timeshare developers may be exposed in ways that are "provable" happens to be factually accurate and not misleading. *See e.g., Overton v. Westgate Resorts, Ltd., L.P.*, 2015 Tenn. App. LEXIS 45 (Tenn. Ct. App. 2015) (affirming judgment against timeshare developer for fraud and misrepresentation). Mr. Aaronson has personally prevailed on some of his legal theories in arbitration against Diamond on at least two occasions. [Exh. C; Exh. D]. Thus, Defendants' advertisements are neither false nor misleading.

### ii. There is No Record Evidence Showing that Mr. Aaronson's Advertisements Deceived Any Members of the Target Audience

"A plaintiff attempting to establish . . . that an advertisement is literally true but misleading, must 'present evidence of deception' in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson Corp.v.Northern Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004). "The success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey that shows that a **substantial percentage** of consumers are taking away the message that the plaintiff contends the advertising is conveying" *P&G v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. Aug. 28, 2008) (emphasis added). Courts find deception rates of 20% or

higher to be sufficient to show deception.[10] *Id.* (citing *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 n. 14 (3d Cir. 1994)).

### a. Plaintiffs' Survey Report Shows that Mr. Aaronson's Advertisements are Not Deceptive

"The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself." *Coors Brewing Co. v. Anheuser-Busch Cos.*, 802 F. Supp. 965, 972 (S.D.N.Y. Aug. 19, 1992). "That objectivity is measured by such factors as whether the survey was properly filtered to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive." *Id.*

Plaintiffs expert defined the "Relevant Population" as "adult consumers (age 18 years or more) in the United States who own or have ever owned a timeshare property" [Exh. M]. This is the wrong population. The relevant population is timeshare owners who *want to get out of their timeshares*. Mr. Aaronson certainly <u>does not</u> cater to people in the market looking to buy *more* timeshares. Thus, the survey is not probative of deception. *See Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 131-32 (2d Cir. 2000) (affirming district court's decision to disregard survey because plaintiff chose the wrong relevant population)

Plaintiffs claim the advertisements are deceptive because they "actually deceived or have the tendency to deceive Diamond Resort members" causing them to "stop[] making payments" or by "delud[ing them] "into filing bogus legal claims against Diamond Resorts." [Doc. 47 ¶ 62]. Further, Diamond's surviving damages claims are the loss of receivables from promissory note

---

[10]Deception rates are calculated by subtracting out the control group percentages from the test group percentages. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 591 (3rd Cir. 2002); *American Home Prods. v. Procter & Gamble Co.*, 871 F. Supp. 739, 748-50 (D.N.J. Dec. 27, 1994) (discussing the need for a survey in a false advertising claim to properly account for "preconceptions, unrelated misinformation, and simple guessing").

payments and recurring fees and various costs associated with the arbitration proceedings. [Exh. O, pgs. 2-13, 24].    Thus, Plaintiffs' survey is only relevant to the extent that it tends to show that the advertisements deceived people into believing that it was permissible to: **(1)** stop making payments on timeshare obligations, and **(2)** file legal claims against timeshare developers based on a belief that timeshare developers were engaged in illegal conduct.

As to **(1),** the relevant questions of the Survey are: Q7, Q9, Q11,[11] Q12, and Q13 because these are the only questions that clearly address the withholding of payments to timeshare developers. [Exh. M pgs. 15 & 16]. After netting out the "noise," the respective deception rates for each of these questions are: 11%, 14%, 6%, 8%, and 4%. All of these deception rates here are well below the 20% threshold. *See Castrol, Inc. v. Pennzoil Quaker State Co.*, 2000 U.S. Dist. LEXIS 15336, at *49 (Oct. 12, 2000) ("Whenever at least 20% of respondents to a survey receive a particular message, the receipt of that message is statistically valid.").

As to **(2)**, the relevant questions of the Survey are: Q10, Q11,[12] and Q14 because these are the only questions that clearly address the issue of retaining an attorney to pursue legal remedies relating to one's timeshare. [Exh M pgs. 15 & 16]. After netting out the "noise," the respective deception rates for each of these questions are: 1%, 12%, and 0%.[13] These deception rates are well below the 20% threshold.

---

[11]The salient portion of Q11 askes "Does the material you reviewed say or suggest that a timeshare owner can stop paying on their time share no matter the reason they want to get out of the timeshare property."

[12]The salient portion of Q11 askes "Does the material you reviewed say or suggest that a timeshare owner can get out of their time share no matter the reason they want to get out of their timeshare property."

[13]Plaintiff's Expert attempts to explain these remarkably damaging results by making some comment on the "expertise and credulity" of attorneys in our society. [Exh. M pg 30]. These attempts to explain away these particularly damaging results not persuasive and ignore the fact that these questions were written by Plaintiff's Expert to test whether or not Mr. Aaronson's advertisements were deceptive to a substantial portion of its intended audience and not whether attorneys are revered in society for their "expertise and credulity."

15

Q1 and Q2 are so-called open ended questions. The Plaintiffs interpretation of the result of these questions is that "a majority of survey respondents took away a message about getting out of their timeshare contract." [Exh. M pg. 24 ]. Another way of phrasing this is that a majority of respondents took away a completely expected and *neutral* message. Plaintiffs' Expert notes a 24% differential in this answer as being "especially powerful". [Exh. M pg. 24]. What is actually especially powerful is that <u>not a single one of the 903 test subjects</u> said anything about how the advertisements were about not paying on financial obligations to timeshare companies or filing bogus legal actions against timeshare companies. Also, Plaintiffs failed to produce the respondents "own words" to allow Defendants and the Court to independently verify the responses. In other words we have to take the Plaintiffs' word for it that the respondents "own words" were all properly assigned to the correct categories. [Control Group Results of Survey Report, Exh. Q pgs. 12-14; Test Group Results of Survey Report, Exh. R pgs. 13-16].

Q5/5a are filter questions. Q5 is overtly leading in that it assumes that the advertisement conveys some message about timeshare companies engaging in unlawful activities. *See Coors Brewing*, 802 F. Supp. at 972 ("Question 5 assumes that the commercial conveys some message comparing how the two beers are made."). The suggestive nature of Q5 is highlighted by its stark contrast to the 75% of respondents in Q1 and Q2 who apparently said that the advertisements conveyed a neutral message. *See Castrol, Inc.,* 2000 U.S. Dist. LEXIS 15336, at *32 (observing that statistical anomalies between open ended and close ended questions point to suggestiveness).

The faults in Q5 taint the probative value of Q5a. Once Q5 suggested that the advertisements conveyed a message about timeshares engaging in unlawful activities, respondents were then primed to respond to Q5a in a similar fashion. The flawed design of Q5 effectively

eliminated the possibility that any of the respondents answering Q5a would respond favorably to

Mr. Aaronson because Q5 served to filter out *every one* of the responded that did not believe that

the advertisements suggested something about timeshare companies engaging in unlawful activities.

This design flaw is evidenced by the fact that only 8 of 565 respondents gave the one answer

favorable to Mr. Aaronson.  Finally, even with the fatal design flaws of the Q5/Q5a questions, when

the noise is netted out of the results for Q5a, there is only a 6% deception rate.[14]  For the above

reasons, the Court should find that the survey shows an overall a lack of deception, or the Court

should disregard the survey

### iii.   Mr. Aaronson's Advertising Had No Material Effect on Consumer's Purchasing Decisions

The third element of a claim of false advertising under the Lanham Act is materiality, which

the Plaintiffs are required to establish regardless of whether the advertisement is literally false or

true but misleading. *Gibson*, 2018 U.S. Dist. LEXIS 80471, at *44 (citing *Osmose*, 612 F.3d at

1319). "To establish the materiality element, Plaintiffs must prove that the Defendants' deception is

likely to influence the purchasing decision of consumers." *Id.* (citing *Osmose*, 612 F.3d at 1319).

"The materiality requirement is based on the premise that not all deceptions affect consumer

decisions." *Lancaster v. Bottle Club, LLC*, No. 8:17-cv-634, 2018 U.S. Dist. LEXIS 78957, at *19

(M.D. Fla. May 10, 2018).

### a. There Is No Record Evidence Showing that any of Mr. Aaronson's Diamond Clients Stopped Making Payment to Diamond or Initiated Litigation Because they Were Deceived by Mr. Aaronson's Advertisements

---

[14]95% of test respondents provided one of the four response to Q5a indicating that timeshare companies engage in unlawful behavior, [Exh. R pg. 21], whereas 89% of the control group gave one of the four same responses to Q5a. [Exh. Q pg. 19]. The exceedingly high percentages for both the test group and the control group strongly suggest, not only that the questions are fundamentally flawed, but also that the timeshare owners overwhelmingly believe that timeshare companies engage in unlawful behavior, regardless of Mr. Aaronson says about them.

Six of Mr. Aaronson's Diamond clients were deposed - First, Elizabeth Hardisty—before she knew Mr. Aaronson, Ms. Hardisty and her husband felt like they had been "duped" by Diamond, were incapable of paying on their timeshare obligations and had made the decision "[t]hat we really didn't want [our timeshare], that it wasn't going to work out for us." [Hardisty Dep., Exh. S at 53:20-24; 60:25-61:3; 100:7-101:1]. When she visited Mr. Aaronson's website, she had virtually no exposure to the subject advertisements.  [Exh. S at 55:23-56:6; 56:17-21; 57:3-6; 80:1-7; 86:5-9; 88:20-24; 89:16-21; 90:1-4; 91:6-10; 91:14-19]. When Ms. Hardisty communicated with a paralegal at Mr. Aaronson's law firm, she was informed of Mr. Aaronson's policy to advise clients to "try their best to keep current with payment …." [Exh S at 64:15-24].

Second, Dr. Kenneth Feldman—before he knew of Mr. Aaronson, Dr. Feldman and his wife decided that Diamond had lied to them and, based on those lies, they wanted to end their relationship with Diamond and stop making payments on their obligations to Diamond. [Feldman Dep., Exh. T pgs. 51:6-19; 122:5-125:7]. Dr. Feldman had minimal exposure to Mr. Aaronson's website advertisements. [Exh T pgs.52:10-15; 55:3-13; 75:16-76:1; 91:19-92:1]. He has no recollection of the contents of the advertisements. [Exh T pgs. 92:2-17]. Private attorney-client discussions regarding whether to continue making payments are not commercial speech and irrelevant to Plaintiffs' Lanham Act claim. *See Incarcerated Entm't, LLC v. Warner Bros. Pictures*, 261 F. Supp. 3d 1220, 1227-29 (M.D. Fla. May 10, 2017) (explaining commercial speech).

Third, Ileana Morrow—before she knew Mr. Aaronson, Ms. Morrow and her husband wanted to get out of their Diamond timeshare because they felt Diamond had lied to them and they could not afford to continue making payments on it. [Morrow Dep., Exh. U pgs. 29:3-20; 30:19-31:2; 48:17-25]. Ms. Morrow had no exposure to the subject advertisements. [Exh. U pgs. 29:21-

30:13; 50:9-51:2]. Ms. Morrow's decision to discontinue payments to Diamond was made on her own. [Exh U pgs. 34:12-15].

Fourth, Era Paloma believed that Diamond had lied to her and her husband before she knew Mr. Aaronson, and she had absolutely no exposure whatsoever to the subject advertisements. [Paloma Dep., Exh V pgs. 44:2-47:20].

Fifth, Emilio Cabrera was never exposed to any of Mr. Aaronson's advertising. [Cabrera Dep. Exh. W pgs. 43:8-45:9]. Before Mr. Cabrera knew Mr. Aaronson, he made up his mind that he was not going to give any more money to Diamond. [Exh. W pgs. 59:11-60:12; 121:10-22; 124:5-13].

Sixth, Michael Childers was never exposed to any of Mr. Aaronson's advertising. [Childer's Dep. Exh. X pgs. 29:1-35:13; 42:2-11; 111:17-113:25]. Mr. Childers could not afford to continue making payments to Diamond before he retained Mr. Aaronson. [Exh. X pgs. 74:11-15; 80:14-21; 116:4-117:14; 125:10-15].

Based on the above testimonial evidence, there is no indication that the target audience wants to buy *more* Diamond timeshares or that the advertising influenced them to do anything except hire Mr. Aaronson.

## FLORIDA LAW CLAIMS

**II.      Florida's Litigation Privilege Bars Plaintiffs' Reliance on any Statements or Acts Made or Committed in the Course of Earlier Arbitration Proceedings to Prove Plaintiffs' Florida Law Claims**

This Court has previously observed that all of Plaintiffs' Florida law claims "arise out of [Mr. Aaronson's] advertising" *Diamond Resorts Int'l, Inc. v. Aaronson*, No. 6:17-cv-1394, 2018 U.S. Dist. LEXIS 23574, at *17 (M.D. Fla. Jan. 26, 2018). While Plaintiff's claims may arise out of

the advertising, they spill over into Mr. Aaronson's representation of his Diamond clients in the arbitration proceedings. Diamond has repeatedly referred to the arbitrations as "bogus" or "shams." "Under Florida law, statements or acts are provided absolute immunity under the litigation privilege if they are: (1) made or committed in the course of judicial or quasi-judicial proceedings; and (2) are connected with, or relevant or material to, the cause in hand or subject of inquiry." *Diamond Resorts Int'l*, 2018 U.S. Dist. LEXIS 23574, at *16; *Kidwell v. Gen. Motors Corp.*, 975 So. 2d 503, 505 (Fla. 2d DCA 2007) (holding that an arbitration proceeding "is a judicial or quasi-judicial proceeding" for purposes of the litigation privilege). Mr. Aaronson is absolutely immune under the litigation privilege from civil liability to the extent that such liability is grounded in statements or acts made or committed in the course of the underlying arbitration proceedings. *See Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 384 (Fla.  2007) ("The litigation privilege applies across the board to actions in Florida …."); *Fernandez v. Haber & Ganguzza, LLP*, 30 So. 3d 644, 646-47 ("The trial court was correct in granting summary judgment in favor of Ganguzza's firm. Although we think that the behavior of the Ganguzza law firm may have been highly unethical, we must affirm."); *Palaxar Group, LLC v. Williams*, No. 6:14-cv-758, 2014 U.S. Dist. LEXIS 146681, at *34-*35 (M.D. Fla. Oct 2, 2014); *Boca Investors Group v. Potash*, 835 So. 2d 273, 276 (Fla. 3d DCA 2002) (J. Cope concurring). There is no sham or bogus exception to the litigation privilege. *Kentish v. Madahcom, Inc.*, 566 F. Supp. 2d 1343, 1347-1349 (M.D. Fla. July 16, 2008) (rejecting sham pleading argument as basis for piercing litigation privilege).

## III.    COUNT II – TORTIOUS INTERFERENCE

To state a claim under Florida law, a plaintiff must prove that: (1) a contract exists; (2) the defendant had knowledge of the contract; (3) the defendant intentionally procured a breach of the

contract; (4) there is no justification or privilege for such breach; and (5) the plaintiff suffered damages from the breach. *See Diamond Resorts Int'l*, 2018 U.S. Dist. LEXIS 23574, at *19 (citing *Johns Enters. of Jacksonville, Inc. v. FPL Grp.*, 162 F.3d 1290, 1321 (11th Cir. 1998). "An agent generally cannot be held liable for tortiously interfering with the contract of its principal, an agent's "privilege to interfere" with the contracts of its principal is not absolute." *Westgate Resorts, Ltd. v. Reed Hein & Assocs., LLC*, No. , 6:18-cv-1088, 2018 U.S. Dist. LEXIS 182132, at *12 (M.D. Fla. Oct. 24, 2018). "The privilege afforded to an agent who gives honest advice that it is in his principal's best interest to breach an existing relationship is not available where the agent acts solely with ulterior purposes and the advice is not in the principal's best interest. *Id.*

Here, Diamond's describes a two phase scheme in which Mr. Aaronson allegedly lures in Diamond timeshare owners using advertising and then instructs them to stop paying Diamond. [Doc. 47 ¶¶ 1-5, 27-3, 36, 70-74]. The advertising itself did not cause anyone to discontinue payments to Diamond. [Exh. U pgs. 29:3-20; 30:19-31:2; 48:17-25; Exh V pgs. 44:2-47:20; Exh. W pgs. 43:8-45:9; Exh. X pgs. 29:1-35:13; 42:2-11; 74:11-15; 80:14-21; 111:17-113:25; 116:4-117:14; 125:10-15]. Therefore, Plaintiffs' tortious interference necessarily turns entirely on: (1) whether Mr. Aaronson advised any Diamond owners to stop paying Diamond (or otherwise "intentionally procured a breach"), and if so (2) whether Mr. Aaronson was privileged at the time he gave any such advice.[15]

Notwithstanding Plaintiffs' faulty premise, Mr. Aaronson did advise a client to discontinue making payments to Diamond. [Exh. S at 144:10-24]. However, this client could not afford to continue making payments to Diamond. [Exh. S at 53:20-24; 60:25-61:3; 100:7-101:1], and the

---

[15]Plaintiff's theory of liability on their tortious interference claim is severely undermined by their own calculation that 57% of Mr. Aaronson's Diamond clients are current on their obligations. [Exh. B 42:4-1].

advice was privileged because, at the time the advice was given, Mr. Aaronson was Ms. Hardisty's attorney, and by extension, her agent. [Exh. S at 144:13-21; Hardisty Retainer Agreement, Exh. Y]. The advice was given by Mr. Aaronson knowing that Ms. Hardisty and her family were going through difficult financial and personal times, [Exh S pgs. 53:25-54:1; 61:1-3; 100:7-14; Aaronson Dep., Exh. Z pgs. 57:16-60:2], and that even though the Hardisty's were then current on their financial obligations, Diamond had locked them out of their account preventing them from booking reservations. [Exh. S pgs. 144:16-145:22]. Mr. Aaronson's advice was honest and in Ms. Hardisty's best interest. Consequently, the advice was privileged and Plaintiffs' tortious interference claim fails as a matter of law.

## IV. COUNT III – TRADE LIBEL[16]

"Under Florida law, a plaintiff alleging trade libel must show: "(1) a falsehood; (2) has been published, or communicated to a third person; (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff; (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood." *Perry v. Naples HMA, LLC*, No. 2:13-cv-36, 2014 U.S. Dist. LEXIS 162330, at *25-*26 (M.D. Fla. Nov. 19, 2014). "The chief characteristic of special damages is a realized loss." *Salit v. Ruden*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999).

Plaintiffs' trade libel claim fails for the same reasons that all of their other claims fail—a lack of causation. There is a total lack of evidence showing that the advertising proximately caused Diamond's arbitration costs and fees; and unpaid promissory notes and timeshare fees. [Doc. 43 pg.

---

[16]Defendants reincorporate their Lanham Act argument that the subject statements are not false.

22

19].[17] Rather, the evidence shows that all of Mr. Aaronson's clients had their own reasons for why they stopped making payments to Diamond. *See Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1349 (M.D. Fla. Feb. 28, 2006) (granting summary judgment on trade libel claim because "plaintiffs proffer no facts, whatsoever, that [false statements] materially affected their desire to professionally contract with [plaintiffs]"). As for the alleged arbitration-related damaged, numerous and necessary intervening events break proximate causation. Consequently, Diamond's claimed damages were not "proximately caused as a result of" the advertisements.

## V.  FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT[18]

### a.  Plaintiffs Have No Actual Damages Under Florida Law and the Advertising Is Not the Cause of the Claimed Damages

"FDUTPA declares unlawful "unfair or deceptive acts or practices" committed "in the conduct of any trade or commerce." *Diamond Resorts*, 2018 U.S. Dist. LEXIS 23574, at *22 (citing Fla. Stat. § 501.204(1)). "A FDUTPA claim has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Id.* (citing *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)). "Generally, the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Democratic Republic of the Congo v. Air Capital Group, LLC*, 614 Fed. Appx. 460, 472 (11th Cir. 2015). "While the Florida DUTPA cases do not use the phrase 'benefit of the bargain' in describing this damages formula, the two are clearly synonymous: the value of the product as

---

[17]*Nat'l Numismatic Certification, LLC v. eBay, Inc.*, No. 6:08-cv-42, 2008 U.S. Dist. LEXIS 109793, at *60 (M.D. Fla. July 8, 2008) ("Florida law requires a plaintiff claiming trade libel to prove special damages by establishing a "pecuniary loss that has been realized or liquidated, as in the case of specific lost sales.")

[18]To the extent that Plaintiffs' FDUPTA claim relies on the subject advertising, Defendants reincorporate their Lanham Act argument that the subject statements are not false.

promised minus the value of the product delivered." *Gastaldi v. Sunvest Resort Cmtys., LC*, 709 F. Supp. 2d 1299, 1304 (S.D. Fla. Mar. 4, 2010).

In *Solarblue v. Trebor Power Sys.*, the Circuit Court for Orange County listed case law explaining the types of damages that are not recoverable under FDUPTA:

> a. *Rollins v. Heller*, 454 So.2d 580 (Fla. 3d DCA 1984) -items stolen in a burglary due to alarm company's deceptive practices were not recoverable under FDUTPA;
> b. *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451 (Fla. 1st DCA 1985) -repair costs for extensive termite damage after receiving false termite inspection certificate were not recoverable under FDUTPA;
> c. *Ft. Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So. 2d 311 (Fla. 4th DCA 1998) - loan payments for a car were not recoverable under FDUTPA;
> d. *Rollins, Inc. v. Butland*, 951 So.2d 860, 870 and 873 (Fla. 2d DCA 2006) - diminution or stigma damages are not recoverable under FDUTPA and that FDUTPA does not allow for recovery of speculative losses, nominal damages, or subjective feelings of disappointment;
> e. *Kia Motors America Corp. v. Butler*, 985 So.2d 1133 (Fla. 3d DCA 2008) - repair and resale damages are not recoverable under FDUTPA.
> f. *Schauer v. Morse Operations, Inc.*, 5 So.3d 2 (Fla. 4th DCA 2009) - damages to a credit rating are not recoverable under FDUTPA.
> g. *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286, 1294 (M.D. Fla. 2009) - future lost profits are not recoverable under FDUTPA.
> h. *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So.3d 178 (Fla. 3d DCA 2010) -down payment, interest on payments, and loan payments for a jet-boat were not recoverable under FDUTPA;

2013 Fla. Cir. LEXIS 2692, at *11 (Fla. Cir. Ct. 2013). Though not identical, Diamond's claimed damages are much more akin to the types of damages that courts had repeatedly found are not recoverable under FDUPTA. Consequently, because Diamond has no actual damages, and their FDUPTA claim necessarily fails. Even if Diamond's claimed damages were recoverable under FDUPTA, their claim still fail because, like Counts I, II, & III, causation is lacking.

## CONCLUSION

For the foregoing reasons, the Defendant's respectfully request that this Court enter an order granting summary judgment to the Defendants on all Counts.

**DATED** this 16th day of November 2018.

/s/  George R. Dietrich
CHARLES J. MELTZ, ESQUIRE
Florida Bar No. 985491
GEORGE R. DIETRICH, ESQUIRE
Florida Bar No.:  1007940

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 16th day of November, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following: **Richard W. Epstein, Esquire** at richard.epstein@gmlaw.com; **Jeffrey A. Backman, Esquire** at jeffrey.backman@gmlaw.com; and **Meredith H. Leonard, Esquire** at meredith.leonard@gmlaw.com.

/s/ George R. Dietrich
CHARLES J. MELTZ, ESQUIRE
Florida Bar No. 985491
GEORGE R. DIETRICH, ESQUIRE
Florida Bar No. 1007940
GROWER, KETCHAM, EIDE, TELAN & MELTZ, P.A.
Post Office Box 538065
Orlando, FL  32853-8065
Telephone: (407) 423-9545
Facsimile:  (407) 425-7104
cjmeltz@growerketcham.com
enotice@growerketcham.com
jclinton@growerketcham.com

*Counsel for Defendants AUSTIN N. AARONSON
and AARONSON, AUSTIN, P.A.*

13159/2971