**A Report on Communication Outcomes Associated with Webpages for Aronson Law**

**Expert Report of David Stewart, Ph.D.**

**In the Matter of Diamond Resorts International, INC., et al. v. Austin Aaronson, et al.**

**September 6, 2018**

## Qualifications

I am President's Professor of Marketing and Business Law at Loyola Marymount University in Los Angeles. I previously served as a tenured member of the faculty and in various administrative roles at Vanderbilt University, the University of Southern California and the University of California, Riverside.  I serve or have served on the editorial boards of more than twenty journals and regularly review manuscripts that have been submitted for publication in these journals, including the *Journal of Marketing*, the *Journal of Public Policy and Marketing*, the *Journal of the Academy of Marketing Science*, the *Journal of Marketing Research*, the *Journal of Advertising*, the *Journal of Advertising Research*, the *Journal of Promotion Management*, the *Journal of Interactive Marketing*, *Media Psychology*, and the *Journal of International Advertising*, among others. I currently serve as Vice President for Publications for the American Marketing Association and I am a past editor of the *Journal of Marketing*. the *Journal of the Academy of Marketing Science* and the *Journal of Public Policy and Marketing*.

I hold three academic degrees in psychology: a B.A. in psychology from the University of Louisiana at Monroe, an M.A. in general experimental psychology from Baylor University, and a Ph.D. in personality psychology from Baylor University.  I have written extensively about market analysis, consumer behavior, market definition and structure, branding, marketing communication, marketing research, and marketing management.  My research has examined how consumers and managers search for and use information in decision making, effective communication with consumers, methods for the study of consumers and their behavior, and the effective and efficient design of marketing programs.  In addition to my work on consumer behavior related to commercial products and services, I have also examined the influences of warnings and disclosures on consumers.  My scholarship has been widely cited and has been

recognized and honored in a number of venues including the receipt of the Ivan Preston Award for Outstanding Lifetime Contributions to Advertising Research by the American Academy of Advertising, the Elsevier Distinguished Marketing Scholar Award by the Society for Marketing Advances, the Cutco/Vector Distinguished Marketing Educator Award by Academy of Marketing Science and the American Marketing Association's Award for Lifetime Contributions to Marketing and Public Policy.

I am a member of the American Marketing Association, the Insights Association, the American Statistical Association, the Association for Consumer Research, the Society for Consumer Psychology, the American Academy of Advertising, the American Psychological Association, the Association for Psychological Science, the American Association for Public Opinion Research, the Psychometric Society, the Academy of Management, and the Institute for Operations Research and Management Sciences, among others. I have also served two terms as a member of the United States Census Bureau's Advisory Committee of Joint Professional Associations and I am a past-chairman of this committee.

I have previously served as Vice President for Finance and as a member of the Board of Directors of the American Marketing Association.  I am a past-president of the Society for Consumer Psychology, a past-chair of the Section on Statistics in Marketing of the American Statistical Association, and a past-president of the Academic Council of the American Marketing Association.  I am a Fellow of both the American Psychological Association and the Association for Psychological Science.

I have taught marketing courses to undergraduates, MBA students, Ph.D. students, and practicing managers for more than thirty-five years. I have taught courses on principles of marketing, consumer behavior, advertising and promotion management, product development

3

and management, marketing research, marketing management, and marketing strategy, among others. I have taught both qualitative and quantitative approaches to marketing research, including the design and use of in-depth personal interviews, customer visits, focus groups, survey research, choice modeling, and marketing experiments to both university students and practicing professionals.  I have offered executive education courses on marketing topics, including marketing research, in more than twenty countries on five continents.

I have served as a consultant for a wide array of business firms, not-for-profit organizations and government agencies. In this work, I have studied marketing activities and consumer behavior and have advised companies, not-for-profit organizations, and government agencies regarding marketing activities.  Among the organizations with which I have consulted are Coca-Cola, General Motors, Visa Services, Hewlett Packard, Agilent Technologies, Hughes, Texas Instruments, Samsung, NCR, IBM, and Cadence Design Systems, among other companies.  I have also served as a consultant to and expert witness for the Federal Trade Commission and the Office of Consumer Protection of the California Attorney General.

As a part of my business experience, academic research, and consulting practice, I have personally designed and conducted focus groups and in-depth customer interviews.  I have also designed and implemented hundreds of surveys.  My experience with survey research includes the design of questionnaires, specification of the relevant universe and sampling frame, identification and implementation of sample selection, supervision of fieldwork, and data analysis and interpretation.  I have published numerous papers using survey methodology and have also published papers on the methodology of survey research.  I have also presented the results of my surveys to academic conferences and to senior managers.  I have offered testimony

regarding surveys, including surveys of my own design, before the Federal Trade Commission and in various Federal and State Courts.

I have offered testimony regarding marketing issues, including issues related to consumer behavior, branding, marketing communications, marketing strategy, deceptive advertising, and intellectual property before the Federal Trade Commission, the United States International Trade Commission, the United States Office of Patent and Trademarks Patent Trial and Appeal Board, and in Federal and State Courts.  I have served as an expert witness for a mixture of plaintiffs and defendants over time.

In the conduct of my work as scholar, teacher, consultant, and expert witness I rely on well-accepted principles and theories in marketing, the behavioral sciences and statistics.  I also place great reliance on properly designed and well-executed empirical research, such as survey research, to inform my opinions.  Such research may be of my own design but may also be research published in refereed journals or conducted to inform business decisions with important economic and/or social consequences.

A copy of my *Curriculum Vitae*, including a complete list of my publications and of my deposition and trial testimony over the past four years, is attached as **Exhibit 1**. The materials I have reviewed in association with my work in this matter are referenced in the report and/or are provided in the Appendices attached to this report.

## Scope of Assignment

I have been retained by counsel for Diamond Resorts International, Inc., Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Development, LLC, and Diamond Resort Management, Inc. (collectively, "Diamond") to examine consumers' responses

to various claims that Diamond alleges were made by Austin N. Aaronson and/or Aaronson, Austin PA (collectively, "Aaronson") on its various Web site pages.  More specifically, I have been asked to design survey research to provide empirical data regarding the claims that representative consumers take away from three Web pages that Aaronson has used to promote its services related to the cancellation of timeshare contracts.

I am being compensated at a rate of $ 1000 per hour for my work on this project.  I have designed and implemented two consumer surveys, which are described in the remainder of this report. My compensation is not dependent on the results of the surveys or the outcome of this particular matter.

## Description of the Surveys

**Approach**

I designed two surveys that were carried out using the ResearchNow Consumer Internet Panel. **Exhibit 2** provides a description of the ResearchNow panel.  One survey was designed to examine consumer response to one of three Web pages used by Aaronson to promote its timeshare cancellation services (test survey).  The three Web pages are included in this report as **Exhibits 3, 4 and 5**. The second survey was designed as a control for the first survey and also included a variety of follow-up questions related more generally to consumers' response to various representations related to timeshare properties and legal services (control survey). The control letter tested in this survey is included in this report as **Exhibit 6**.

The design of both surveys followed well-accepted protocols for survey research and used a test/control approach.[1] In such survey designs the responses of one group of respondents

---

[1] Shari Seidman Diamond (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition (Washington, D.C.: National Academies Press), pp. 359 – 423; see also Shari Seidman

are compared to a second group of comparable respondents who differ only with respect to history or the stimuli to which they are exposed.  Any differences between such groups would be attributable to differences in the history of the groups or the differences in the stimuli to which the groups were exposed.

It is important to note that the design of the survey is very conservative in that it exposes respondents to the stimulus materials only once, though the materials remained available for review. Nevertheless, it is well-recognized that multiple exposures through multiple modalities over time is much more likely to register with consumers than a single exposure.[2] The messages contained in the Aaronson Web pages would very likely register with more consumers and be remembered better if there were multiple exposures over time.

The survey is also quite conservative because the control very likely overstates the number of respondents who appear to take away specific messages from the control, especially in response the closed-ended questions. I am informed that there has been substantial amount of advertising by numerous organizations that is similar to the Aaronson Web site pages. To the extent that this advertising is in the market and has been seen and processed by time share owners, the beliefs it has created will be present in the minds of survey respondents who see the control in this survey. Thus, some of the response to the control will reflect prior exposure to advertising. It is impossible to determine the degree to which responses to the control reflect prior beliefs created by advertising similar to that employed by Aaronson. Nevertheless, if there is any effect of this prior advertising, it is to inflate responses in the control condition, which, in turn reduces the net number of respondents and percentage of respondents who report particular

---

Diamond and Jerre Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, (ABA Book Publishing).
[2] J. Craig Andrews and Terence Shimp (2018), *Integrated Marketing Communications*, 10th Edition, (Boston: Cengage), Chapter 16.

beliefs that are specifically in response to the Aaronson Web pages.

**Objectives of the Surveys**

The surveys were designed to determine whether and the extent to which consumers who own or have owned a timeshare property obtained misleading or deceptive beliefs or inferences from the Aaronson Web pages and the degree to which such beliefs may influence consumers' decisions and actions.

**Methodology**

The Relevant Population

The relevant population for both of the surveys was defined as adult consumers (age 18 years or more) in the United States who own or have ever owned a timeshare property.

The Sample

Sampling is a process by which individuals are selected for participation in a survey. The procedures that guide the selection of a sample are referred to as the "sampling plan." A critical element of sound survey research is the use of a sampling plan that assures that the individuals included in the survey are representative of the relevant population. In the present surveys invitations to participate in the survey were sent to a randomly selected members of the ResearchNow consumer Internet panel (a description of this panel is provided in **Exhibit 2**).[3]

---

[3] Consumer panels have been in use for more than 100 years. Well-constructed and well-maintained consumer panels are frequently and appropriately used in research by business, government and other organizations to inform decisions of significant import. See Seymour Sudman and Brian Wansink (2002), *Consumer Panels*, 2nd Edition, (Mason, OH: South-Western).

Because respondents may choose to participate in the survey or not, the samples are non-probability samples.  In marketing and consumer research, non-probability sampling designs, such as those used in the present survey, are the most common type of sampling.  Academic and commercial researchers widely and appropriately rely upon well-designed and properly executed non-probability samples.  Business decisions of considerable import are routinely based on the results obtained from the use of such well-constructed sampling plans.

Although statistical estimation requires a true probability sample in order to meet underlying statistical assumptions, in my experience it is common to compute measures of statistical precision and error when using non-probability samples since these measures provide some sense of the relative accuracy of specific outcomes obtained in a survey.  This practice was followed in the present study.

Sample Size

The total sample for test  survey included 903 respondents approximately equally divided between males and females. In order to assure the representativeness of the sample, quotas for gender, age and geographic census region were employed for the invitations to participate in the survey.[4] The sample was equally divided into three groups who were randomly assigned to view and answer questions about one of the three Aaronson Web pages.  Thus, 301 respondents saw and answered questions about one of the three Web pages. The sample size for the control survey included 403 respondents approximately equally divided between male and female respondents. The same gender, age and geographic quotas used in the test survey were employed for invitations in the control survey.

---

[4] Invitations were based on United States Census data for adults age 18 and older.

9

Under appropriate statistical assumptions, a sample size of 301 provides estimates of population statistics that are, in the worst case, within approximately plus or minus five point six-five percent(5.65%) of the true population statistics ninety-five percent (95%) of the time.[5]

Selection of Respondents

Respondents who participated in the surveys are members of the ResearchNow consumer Internet panel.  An e-mail invitation to participate in a survey was sent to a random sample of members of the panel.  As noted earlier, in order to assure that the samples were broadly representative of the relevant population, quotas were established for age, gender and geography.

Questions were presented to respondents via the Internet.  Two questionnaires were used in each survey: (1) a "screener" that included questions used for identifying members of the previously defined population[6], and (2) a main questionnaire that included questions asked only of respondents who met the qualifications for inclusion in the sample (copies of screen shots of the screener and main questionnaires are included in **Exhibit 7a** for the test survey and in **Exhibit 7b** for the control survey).

The screener questionnaire of the surveys included questions that determined whether an individual was a member of the relevant population. Respondents who met all of the qualifications of membership in the relevant population based on their responses to the screener questions were transitioned to the main questionnaire. Respondents who were disqualified from participation by virtue of their responses to the screener questions were thanked and the survey was terminated.

The screener questionnaire included questions related to gender, age, and geography, as

---

[5] Formulas for the determination of sample size and sampling error are described in various textbooks on survey and marketing research. See for example: David A. Aaker, V. Kumar, and George S. Day (2004), *Marketing Research*, Eighth Edition, (New York: Wiley), pp. 402 – 431.
[6] The screener was the same for both surveys.

well as a question that asked whether the respondent had ever owned a timeshare property. The screener also included a question related to the employment of the respondent and members of his or her household.  As is customary in survey research, individuals who indicated that they or someone in their household worked for an advertising agency, a public relations firm, a market research company, or a company that sells or manages real estate were excluded from further participation in the survey on the grounds that such individuals are likely to be atypically knowledgeable about the topic of interest.  Such atypical respondents are routinely excluded from marketing surveys.[7]

Internet surveys are well-accepted in the field of survey research as a standard, reliable methodology and are now the most common method of conducting survey research.[8] Businesses and other organizations routinely make decisions of great importance based on the results of Internet survey research among consumers and such surveys have been accepted in evidence in numerous U.S. District Court cases.  The samples used in the present survey were provided by ResearchNow, a leading supplier of Internet samples for surveys. I have worked with ResearchNow on many surveys and have found their procedures and panels to be highly reliable. ResearchNow has a large and diverse panel consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research. ResearchNow utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. ResearchNow employs a "by-invitation-only" panel recruitment model to enroll pre-validated individuals and, therefore, maintains a panel comprised of the most credible

---

[7] Joseph F. Hair, Jr., Robert P. Bush, and David J. Ortinau (2003), *Marketing Research*, Second Edition, (New York: McGraw-Hill), p. 476.
[8] Don A. Dillman, Jolene D. Smyth, and Leah Melani Christian (2014), *Internet, Phone, Mail, and Mixed-mode Surveys: The Tailored Design Method*, (New York: Wiley); Roger Tourangeau and Shari Seidman Diamond (2012), "Internet Surveys for Evaluating Trademark Infringement and Deceptive Advertising," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, (Chicago: ABA Publishing).

survey takers who are less prone to self-selection bias.

ResearchNow uses a double opt-in approach to panel construction. Potential panelists opt-in during an enrollment process, and then they are sent a follow-up email confirmation that requests the potential panelist to click a link to validate the opt-in. Then, he or she is sent a follow-up email providing access to their member account and they can begin receiving surveys. A unique email address is required to opt-in to the panel and physical addresses provided by panelists in the US are verified against government postal information.

Accurately Reported Data

All survey respondents input their responses from their own computer keyboard, and these responses were recorded electronically.  ResearchNow employs an identity verification procedure when recruiting members for its Internet panels.  ResearchNow uses a variety of invitations, including emails, telephone alerts, and banners and messages on websites. Respondents may only participate in the survey if they input an individual password recognized by ResearchNow. Such identity verification is regarded as a best practice in the management of Internet surveys and serves to assure that the respondent to a specific survey is the actual panel member.[9]

All completed questionnaires were evaluated by California Survey Research Services for consistency and for evidence that respondents followed the directions, a process known in survey research as editing.[10]  Coding classifications for responses to open-ended questions in the survey

---

[9] Council of American Survey Research Organizations, Code of Standards and Ethics for Survey Research, http://www.casro.org/codeofstandards.cfm.  See also: Gabriel M. Gelb and Betsy D. Gelb (2007), "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, 97 (5), 1073 – 1088.

[10] William G, Zikmund, Barry J. Babin, Jon C. Carr, and Mitch Griffin (2012), *Business Research Methods*, 9th Edition, (Mason, OH: Cengage Learning), Chapter 19. Editing is also common in surveys sponsored by the Federal government, see Linda L. Stinson and Sylvia Kay Fisher (1996), "Overview of Data Editing Procedures in Surveys Administered by the Bureau of Labor Statistics: Procedures and Implications," paper to be presented at the first

were developed by professional coders employed by California Survey Research Services. These coders had no knowledge of the purpose of the survey.  I personally reviewed and approved these coding classifications, which were subsequently used by the coders to classify open-ended responses and for data tabulation and reporting. The codebook used in coding the verbatim responses is provided in **Exhibit 8**.

Pretests

Prior to initiation of the test survey a pre-test was carried out with a sample size of 100 respondents. The pre-test indicated that the sampling plan and questionnaires worked well, with no apparent problems. Therefore, no changes were made to the test survey and the respondents obtained from this pre-test were incorporated in the final sample for the test survey. Similarly, a pre-test for the control survey was carried out with a sample size of 100 respondents. No changes were made to the survey design or questionnaire as a result of the pre-test and the respondents obtained in this pre-test were incorporated in the final sample for the control survey.

Main Questionnaire for the Test Survey

The main questionnaire for the test survey involved the presentation of one of the three Aaronson Web pages to each respondent. The Web page that an individual respondent saw was randomly determined. After reviewing the letter respondents were asked a series of questions:

Q1.  In your own words, what was the main message or messages of the material that you just saw? Please be as specific and detailed as possible.

Q2.  What else, if anything, did the material communicate or suggest to you?  Please

---

International Computer-Assisted System Information Computing (CASIC) Conference to be held in San Antonio, Texas on December 12, 1996.

be as specific and detailed as possible.

97.  Nothing else

98.  Don't know/no opinion

Q3. Based on your reading of this material, would you be more or less likely to keep your time share property, or would it make no difference?

_____ More likely to keep time share property

_____ Neither more or less likely to keep time share property

_____ Less likely to keep time share property

_____ Don't know/not sure

Q4. Based on your reading of this material, did your opinion of the time share industry change?

_____ Yes [**Go to Q4a**]
_____ No [**Go to Q5**]
_____ Don't know/not sure [**Go to Q5**]

Q4a.   How did your reading of this material change your opinion of the time share industry?

_____ I have a more positive opinion of the time share industry
_____ I have a less positive opinion of the time share industry
_____ Something else [please specify: _____]

_____ Don't know/not sure

Q5. Does this advertisement say or suggest anything about timeshare companies engaging in unlawful activities?

_____ Yes [**Go to Q5a**]
_____ No [**Go to Q6**]
_____ Don't know/not sure [**Go to Q6**]

Q5a. What does this advertisement say or suggest about timeshare companies engaging in unlawful activities?

_____ No timeshare companies engage in unlawful activities
_____ A few timeshare companies engage in unlawful activities

_____ Many timeshare companies engage in unlawful activities
_____ Most timeshare companies engage in unlawful activities
_____ All timeshare companies engage in unlawful activities
_____ None of the above
_____ Don't know/not sure


Q6. Based on your reading of this material, do you believe timeshare management breached a duty that it owes to its timeshare owners?
_____ Yes
_____ No
_____ Don't know/not sure

Q7. Based on your reading of this material, do you believe that timeshare
        owners …
_____ Must be permitted to cancel their contracts if they choose to
_____ Cannot cancel their contracts even if they wish to do so
_____ Don't know/not sure


Q8. Based on your reading of this material, are you …
_____ More likely to buy a timeshare
_____ Less likely to buy a timeshare
_____ Neither more nor less likely to buy a timeshare
_____ Don't know/not sure

Q9. Based on your reading of this material, do you believe you are entitled to stop paying the annual maintenance fees associated with your timeshare?"
_____ Yes
_____ No
_____ don't know/not sure


Q10.  Based on what you saw in this material, do you believe that the attorneys:

_____ Can obtain cancellation of any time share contract
_____ Can obtain cancellation of most time share contracts
_____ Can obtain cancellation of some time share contracts
_____ Cannot obtain cancellation of time share contracts
_____ Don't know/not sure

Q11.  Does the material you reviewed say or suggest that a time share owner …. Select all that apply.
_____ Can get out of their time share no matter the reason they want to get out of their timeshare
        property

\_\_\_\_\_ Can stop paying on their time share no matter the reason they want to get out of the
 timeshare property
\_\_\_\_\_ Can easily sell their time share property
\_\_\_\_\_ Can trade their time share property for a different property
\_\_\_\_\_ None of the above

Please assume that you own a time share property that you no longer wanted, and you
called the law offices described in the advertisement you just saw to ask for advice
about your time share property.

Q12.  If when you called the law office described in the materials you read, you were
told that you should immediately stop making payments on the time share, including
any mortgage and maintenance fees, what would you do?

\_\_\_\_\_ Stop making payments
\_\_\_\_\_ Get an opinion from another attorney
\_\_\_\_\_ Continue making payments
\_\_\_\_\_ Something else (Please specify: _____)
\_\_\_\_\_ Don't know/not sure

Q13.   If you were told in an advertisement that your timeshare company had
engaged in unlawful activities related to your purchase of your timeshare property, do
you believe that this would justify your withholding payments on your timeshare
property?

\_\_\_\_\_ Yes
\_\_\_\_\_ No
\_\_\_\_\_ Don't know/not sure

Q14.   If a law firm told you that there is a very high probability that your timeshare developer is
exposed legally in ways that are relatively straightforward and provable, would you be …
\_\_\_\_\_ More likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_ Less likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_ Neither more nor less likely to retain that law firm to get you out of your timeshare
 contract
\_\_\_\_\_ Don't know/not sure

<u>Main Questionnaire for the Control Survey</u>

The main questionnaire for the control survey were designed to parallel those in the test

survey. All questions in the test survey are also present in the control survey and the first five

questions, through Q5a, were identical in content and order. As was the case for the test survey respondents were first asked to review the control letter. Following review of this letter respondents were asked a series of questions:

Q1.  In your own words, what was the main message or messages of the advertisement that you just saw? Please be as specific and detailed as possible.

Q2.  What else, if anything, did the advertisement communicate or suggest to you?  Please be as specific and detailed as possible.

97.  Nothing else

98.  Don't know/no opinion

Q3. Based on your reading of this advertisement, would you be more or less likely to keep your time share property, or would it make no difference?

_____ More likely to keep time share property

_____ Neither more or less likely to keep time share property

_____ Less likely to keep time share property

_____ Don't know/not sure

Q4. Based on your reading of this advertisement, did your opinion of the time share industry change?

_____ Yes [**Go to Q4a**]
_____ No [**Go to Q5**]
_____ Don't know/not sure [**Go to Q5**]

Q4a. How did your reading of this advertisement change your opinion of the time share industry?

_____ I have a more positive opinion of the time share industry
_____ I have a less positive opinion of the time share industry
_____ Something else [please specify: _____]
_____ Don't know/not sure

Q5. Does this advertisement say or suggest anything about timeshare companies engaging in unlawful activities?

_____ Yes [**Go to Q5a**]
_____ No [**Go to Q6**]
_____ Don't know/not sure [**Go to Q6**]

Q5a. What does this advertisement say or suggest about timeshare companies engaging in unlawful activities?
_____ No timeshare companies engage in unlawful activities
_____ A few timeshare companies engage in unlawful activities
_____ Many timeshare companies engage in unlawful activities
_____ Most timeshare companies engage in unlawful activities
_____ All timeshare companies engage in unlawful activities
_____ None of the above
_____ Don't know/not sure


Q6. Based on your reading of this article, what is your perception of a timeshare management company managing the resorts within its resort collection?
_____ It is in the best interest of owners that the time share units in the resort collection
_____ It is not in the best interest of owners that the time share units in the resort collection
_____ It does not matter one way or the other
_____ don't know/not sure

Q7. Based on your reading of this article, do you believe that it is unlawful for a time share management company to manage the time share properties in its resort collection?
_____ Yes
_____ No
_____ don't know/not sure

Q8. Based on your reading of this article, do you think that time share management companies have a conflict between their interest in making money and their concern for their timeshare owners?
_____ Yes
_____ No
_____ don't know/not sure

Q9. Based on you reading of this article, do you believe timeshare management breached a duty that it owes to its timeshare owners?
_____ Yes
_____ No
_____ don't know/not sure


Q10. Based on your reading of this article, do you believe that timeshare owners …
_____ must be permitted to cancel their contracts if they choose to
_____ cannot cancel their contracts even if they wish to do so
_____ don't know/not sure

Q11. Based on your reading of this article, are you …

_____ more likely to buy a timeshare
_____ less likely to buy a timeshare
_____ neither more nor less likely to buy a timeshare
_____ don't know/not sure

Q12. Based on your reading of this article, do you believe you are entitled to stop paying the annual maintenance fees associated with your timeshare?"
_____ Yes
_____ No
_____ don't know/not sure

Q13.  Based on what you saw in the advertisement, do you believe that the attorneys:

_____ Can obtain cancellation of any time share contract
_____ Can obtain cancellation of most time share contracts
_____ Can obtain cancellation of some time share contracts
_____ Cannot obtain cancellation of time share contracts
_____ Don't know/not sure

Q14.  Does this advertisement say or suggest that a time share owner …. Select all that apply.
_____ Can get out of their time share no matter the reason they want to get out of their timeshare property
_____ Can stop paying on their time share no matter the reason they want to get out of the timeshare property
_____ Can easily sell their time share property
_____ Can trade their time share property for a different property
_____ None of the above

Please assume that you own a time share property that you no longer wanted, and you called the law offices described in the advertisement you just saw to ask for advice about your time share property.

Q15.  If when you called the law office described in the advertisement, you were told that you should immediately stop making payments on the time share, including any mortgage and maintenance fees, what would you do?

_____ Stop making payments
_____ Get an opinion from another attorney

\_\_\_\_\_ Continue making payments
\_\_\_\_\_ Something else (Please specify: _____)
\_\_\_\_\_ Don't know/not sure

Q16.  If you were told in an advertisement that your timeshare company had engaged in unlawful activities related to your purchase of your timeshare property, do you believe that this would justify your withholding payments on your timeshare property?
\_\_\_\_\_ Yes
\_\_\_\_\_ No
\_\_\_\_\_ Don't know/not sure

Q17.  If a law firm told you that it can obtain a quick resolution of timeshare disputes within 12 to 18 months because it has already negotiated a fast-track process with the timeshare developers, would that make you …
\_\_\_\_\_ more likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_ less likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_ neither more nor less likely to retain that law firm to get you out of your timeshare
          contract
\_\_\_\_\_ don't know/not sure

Q18.  If you retained a law firm to get you out of your timeshare contract and that law firm told you that all its cases end with a full and total removal of the timeshare with a settlement agreement that discharges your debt, shows a fully paid, zero balance on your credit report and assures proper tax treatment, would that make you …
\_\_\_\_\_ more likely to continue to make payments on your timeshare while the legal matter was still
          pending
\_\_\_\_\_ less likely to continue to make payments on your timeshare while the legal matter was still
          pending
\_\_\_\_\_ neither more nor less likely to continue to make payments on your timeshare while the
legal   matter was still pending
\_\_\_\_\_ don't know/not sure

Q19.  If a law firm promised you a 100% money back guarantee, would you be …
\_\_\_\_\_ more likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_ less likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_Neither more nor less likely to retain that law firm to get you out of your timeshare
          contract
\_\_\_\_\_ Don't know/Not sure

Q20.   If a law firm represented that it had cancelled more than 10,000 timeshares for owners no longer interested timeshare ownership, would you be …
\_\_\_\_\_ more likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_ less likely to retain that law firm to get you out of your timeshare contract
\_\_\_\_\_neither more nor less likely to retain that law firm to get you out of your timeshare
          contract
\_\_\_\_\_ don't know/not sure

Q21.   If a law firm told you that there is a very high probability that your timeshare developer is exposed legally in ways that are relatively straightforward and provable, would you be …
_____ more likely to retain that law firm to get you out of your timeshare contract
_____ less likely to retain that law firm to get you out of your timeshare contract
_____ neither more nor less likely to retain that law firm to get you out of your timeshare contract
_____ don't know/not sure

Q22.  If a law firm told you that it could prevent debt collectors from calling and harassing you, giving you a layer of protection that would give your attorney and you the leverage to negotiate your timeshare exit, would that make you …
_____ more likely to continue to make payments on your timeshare while the legal matter was still

pending

_____ less likely to continue to make payments on your timeshare while the legal matter was still pending
_____ neither more nor less likely to continue to make payments on your timeshare while the legal    matter was still pending
_____ don't know/not sure

Q23.  If a timeshare exit company promises that they will get you out of your timeshare, or give you a full refund of your fee, would you be …
_____ more likely to retain that company to get you out of your timeshare contract
_____ less likely to retain that company to get you out of your timeshare contract
_____ Neither more nor less likely to retain that company to get you out of your timeshare contract
_____ Don't know/not sure

Q24.  If a timeshare exit company tells you that they are an industry leader, with a 100% money back guarantee that they will get you out of your contract or give you a full refund, would you be ….
_____ more likely to retain that company to get you out of your timeshare contract
_____ less likely to retain that company to get you out of your timeshare contract
_____ neither more nor less likely to retain that company to get you out of your timeshare contract
_____ don't know/not sure

Q25.  If a timeshare exit company states that it has a 100% success rate, would you be …

_____ more likely to retain that company to get you out of your timeshare contract
_____ less likely to retain that company to get you out of your timeshare contract
_____ neither more nor less likely to retain that company to get you out of your timeshare contract

_____ don't know/not sure

Q26.  If in connection with your timeshare, a timeshare exit company represents that:

- The deed is transferred from your name permanently;
- You are no longer liable for taxes and maintenance fees forever; and
- You will NEVER have any legal obligation to your timeshare again

would you be …
_____ more likely to retain that company to get you out of your timeshare
_____ less likely to retain that company to get you out of your timeshare
_____ neither more nor less likely to retain that company to get you out of your timeshare
_____ don't know/not sure


Q27.  If a timeshare exit company told you that it confronts your timeshare company with legal action, which compels the timeshare company to dissolve your contract, would you be …

_____ more likely to hire the timeshare exit company to get you out of your contract
_____ less likely to hire the timeshare exit company to get you out of your contract
_____ neither more nor less likely to hire the timeshare exit company to get you out of your contract
_____ don't know/not sure


<u>Questions Were Clear and Not Leading</u>

The questions used in the survey were simple and direct.  The open-ended questions allowed respondents to answer in their own words.  Care was taken to craft non-leading questions that were clear and concise.


<u>Survey Was Conducted by Qualified Persons Following Proper Procedures</u>

I personally designed the survey.  Under my supervision, California Survey Research Services, a well-known Internet, mail, and telephone survey research agency that has implemented survey research for leading companies throughout the United States, coordinated computer programming, data collection, coding and data tabulation.  The list of potential respondents was provided by ResearchNow, one of the largest and most widely used providers of

22

Internet based panels (**See Exhibit 2**). I have personally worked with California Survey Research Services and ResearchNow for many years and have found their work to be reliable and of high quality.

Process Was Conducted to Ensure Objectivity

Respondents and line personnel in the survey research agency were kept uninformed about the purpose and sponsorship of the study. Without such knowledge, the possibility that some respondents might correctly guess the purpose and/or the sponsor of the investigation is minimized. Similarly, without knowledge of the purpose and sponsorship of the survey, research agency personnel involved in such tasks as coding are unlikely to bias results in any particular direction.[11]

Per California Survey Research Services, data collection for the test survey occurred between August 6, 2018 and August 10, 2018. Data collection for the control survey was begun on June 20, 2018 and was completed on June 27, 2018. The cost of data collection for the test survey was $ 23,500; the cost of the control survey was $ 12,900.

**Findings of the Surveys**

Summary tabulations of the responses to the test survey are provided in **Exhibit 9**. The results obtained for the three Aaronson Web site pages are very similar. Therefore, in discussing the results in the remainder of this report, the combined results across the three Web site pages will be used. Summary tabulations for the responses to the control survey are provided in **Exhibit 10**.

---

[11] An advantage of an Internet survey is that it eliminates any potential for interviewer bias because there are no interviewers. See Gabriel M. Gelb and Betsy D. Gelb (2007), "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, 97 (5), 1073 – 1088.

The responses to the initial open-ended questions (Q1 and Q2) make clear that a majority of survey respondents took away a message about getting out of their timeshare contract from the Aaronson webpages. In contrast, only one percent of the respondents who saw the control letter mentioned anything about getting out of their contract. Twenty-five percent of the respondents who saw one of the Aaronson web pages gave a response to Q1 or Q2 to the effect that Timeshares are a scam/use fraud tactics/deceptive high-pressure tactics. Only 1% of the respondents in the control condition gave such a response. This difference, of 24%, is especially powerful because respondents were able to answer these questions in their own words. Such questions do not suggest answers and reveal what is top-of-mind among respondents and as a result, dispositive results are generally accorded considerable weight.[12]

Of course, there are many issues that do not readily lend themselves to top-of mind inquiry. In such circumstances it is necessary and appropriate to use closed-ended questions, as was done in the present survey. For complex communications, such as the Aaronson Web pages, it is necessary to ask numerous questions to determine what respondents take away. In interpreting the results obtained from such questions it is important look at the pattern of responses across questions. It is well-established that individuals selectively attend to complex information, and therefore, not every respondent will take away the same information.[13]  It has also been demonstrated that recipients of complex information often miss or miscomprehend information.[14] There are individual differences in what people attend to, what they remember and

---

[12] Jacob Jacoby (2012), "Are Closed-ended Questions Leading Questions?," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, (Chicago: ABA Publishing), pp. 261 – 284.

[13] A. M. Treisman (1969), "Strategies and Models of Selective Attention, *Psychological Review*, 63, 282 – 299; J. Kallenbach, S. Närhi, and P. Oittinen (2007), "Effects of Extra Information on TV Viewers' Visual Attention, Message Processing Ability, and Cognitive Workload," *ACM Computers in Entertainment*, 5, 1–13.

[14] Jacob Jacoby and Wayne Hoyer (1987), *The Comprehension and Miscomprehension of Print Communications*, (New York: The Advertising Education Foundation, Inc.).

how well they can articulate what they have seen or read.[15] Thus, across multiple items it is to be expected that some differences in responses will emerge. It is for this reason that multiple closed-ended questions are used in most surveys, in addition to open-ended questions. The responses to each of the individual questions will be presented first, then the pattern of responses will be discussed in the remainder of this report.

Twenty-four percent of the respondents who saw one of the Aaronson Web pages indicated that the Web pages made them less likely to keep their timeshare property (Q3). Only 9% of respondents who saw the control letter indicated that it made them less likely to keep their timeshare property. This difference is statistically significant and would occur by change less than one time in a hundred.

Thirty-two percent of the respondents who saw one of the Aaronson Web pages reported that the Web page changed their opinion of the timeshare industry (Q4), compared to only 20% of the respondents who saw the control letter. This difference is also statistically significant and would occur by chance along less than one time in a hundred. Among respondents who reported that the Aaronson Web pages changed their opinion, 56% reported that they had a less positive opinion of the industry (Q4a). In contrast, only 28% of the respondents who saw the control letter and reported that it changed their opinion of the timeshare industry reported that the letter resulted in a less positive opinion of the industry. Thus, 18% of all respondents who saw one of the Aaronson Web pages indicated that the letter changed their opinion of the industry in a less positive direction. In contrast, only six percent of the respondents who saw the control letter indicated that the letter changed their opinion of the industry in a less positive direction. This latter result is statistically significant and would occur by chance less than one time in a hundred.

---

[15] Miranda McIntyre and William G. Granziano (2016), "Seeing People, Seeing Things, Individual Differences in Selective Attention," *Personality and Social Psychology Bulletin*, 42 (9), 1258 – 1271.

Sixty-three percent of the respondents who saw one of the Aaronson Web pages reported that they said or suggested something about timeshare companies engaging in unlawful activities (Q5). In contrast, only 25% of the respondents who saw the control letter reported that it said or suggested something about timeshare companies engaging in unlawful activities. This result is statistically significant and would occur by chance less than one time in a hundred. Among respondents who saw one of the Aaronson Web pages and indicated that they said or suggested something about unlawful activities, 68% indicated that the Web pages said or suggested that many, most or all timeshare companies engage in unlawful activities (Q5a). In contrast, among respondents who saw the control letter and indicated that it said or suggested something about unlawful activities, only 14% indicated that the letter said or suggested that many, most or all timeshare companies engage in unlawful activities. Thus, among all respondents who saw one of the Aaronson Web pages, 43% reported that the letters said or suggested that many, most or all timeshare companies engage in unlawful activities. In contrast, only 4% of respondents who saw the control letter reported that the letter said or suggested that many, most or all timeshare companies engage in unlawful activities. This difference is statistically significant and would occur by chance less than one time in a hundred.

In response to the question about whether the respondent believed, based on reading the material they saw, that timeshare management breached a duty that it owes timeshare owners, (Q6 in the test survey and Q9 in the control survey), 59% of the respondents who saw one of the Aaronson Web pages answered in the affirmative compared to 32% of the respondents who saw the control letter. This difference is statistically significant and would occur by chance less than one time in a hundred.

In response to the question about whether, based on a reading of the material they saw, respondents believed that time share owners must be permitted to cancel their contracts if they choose to (Q7 in the test survey and Q10 in the control survey), 61% of the respondents who saw one of the Aaronson Web pages answered in the affirmative compared to 50% who saw the control letter. This difference is statistically significant and would occur by chance less than one time in a hundred.

In response to Q8 (Q11 in the control survey), 42% of the respondents indicated that reading one of the Aaronson Web pages made them less likely to buy a timeshare compared to only 25% of the respondents who saw the control letter. This difference is statistically significant and would occur by chance less than one time in a hundred.

In response to Q9 (Q12 in the control survey), 36% of the respondents who saw one of the Aaronson Web pages indicated that based on a reading of the material they were entitled to stop paying the annual maintenance fee associated with their timeshare. In contrast, only 22% of the respondents who saw the control letter believed they were entitled to stop paying their maintenance fee. This difference is statistically significant and would occur by chance less than one time in a hundred.

In response to the question about whether the respondent believed, based on the material they read, that attorneys can obtain cancellation of any or most timeshare contracts (Q10 in the test condition and Q13 in the control condition), 35% of the respondents who saw one of the Aaronson Web pages answered in the affirmative compared to 34% of the respondents who saw the control letter.  This difference small and not statistically significant.

In response to Q11 (Q14 in the control survey), respondents answered as follow:

|  | Saw Aaronson Web Page | Saw Control Letter |
|---|---|---|
| Can Get Out of Their Timeshare No Matter the Reason* | 30% | 18% |
| Can Stop Paying On Their TimeShare No Matter the Reason** | 18% | 12% |
| Percent of Respondents Who Gave Both Responses | 6.4% | 8.4% |
| Percent of Respondents Who Gave One of These Two Responses But Not Both* | 41.6% | 21.6% |

* This difference is statistically significant and occur by chance less than one time in a hundred.
** This difference is statistically significant and occur by chance less than five times in a hundred.


Thus, across multiple items there is strong evidence that the Aaronson Web pages creates impressions and beliefs that are adverse to timeshare management organizations or are deceptive. The probability that such a pattern would emerge by chance, rather than in response the Aaronson Web pages, is substantially less than one in a million. When placed in the context of the results obtained in response to the two open-ended questions there is a strong evidence that a substantial number of the respondents in the survey took away one or more misleading or disparaging claims. Courts have relied on percentages as low as 7.5 percent, 10 percent and 15%

as the definition of substantial.[16] As was discussed earlier in this report, and will be elaborated in the conclusion of this report, these results were obtained based on a very conservative control condition and a single exposure to the Aaronson Web pages.

Three questions asked about the effect a particular hypothetical communication might have on the respondent rather than what they took away from any particular Web page or letter. These three questions do not reflect what was communicated to respondents by the materials they were shown. Rather, the questions go to the issue of how a hypothetical communication might influence the respondents. Thus, differences between the respondents in one of the test conditions and the control condition would not be expected to significantly differ. Nevertheless, it is informative to compare these groups to validate the consistency of responses across surveys.

Respondents were asked if when they called the law office described in the material they saw, they were told to immediately stop making payments on their timeshare property, they would stop making payment (Q12 in the test survey and Q15 in the control survey). Twenty percent of the respondents who saw one of the Aaronson Web site pages indicated that they would stop making payments. In contrast, 12% of the respondents who saw the control indicated that they would stop making payments.

Respondents were also asked if they were told in an advertisement that their timeshare company had engaged in unlawful activities related to their purchase of their timeshare property, this would justify their withholding payments on the property (Q13 in the test survey and Q16 in the control survey). Forty-four percent of the respondents who saw one of the Aaronson Web

---

[16] Gerald L. Ford (2012), "Survey Percentages in Lanham Act Matters," in ?," in Shari Seidman Diamond and Jerre B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, (Chicago: ABA Publishing), pp. 311 – 326.

pages agreed that withholding payment would be justified in such cases and 40% of respondents who saw the control letter agreed that withholding payment would be justified in such cases.

Finally, respondents were asked if they were told by a law firm that there was a very high probability that their timeshare developer was exposed legally in ways that are relatively straight-forward and provable, would they be more likely to retain that law firm (Q14 in the test survey and Q21 in the control survey). Fifty-five percent of the respondents who saw one of the Aaronson Web pages answered in the affirmative compared to 55% of the respondents who saw the control letter.

The results of these latter three questions make clear that the decision-making and behavior of many respondents would be influenced by what they learn from a law firm. This is not a surprising finding given the perceived expertise and credulity of experts.[17]

## Conclusions

The surveys reported here produces a pattern of responses that provides compelling evidence that the Aaronson websites communicate misleading information about the services provided by Aaronson and disparaging content about time share management companies. Across multiple items there are statistically significant differences between the responses offered by survey participants who saw one of the Aaronson websites and a control letter. In addition, as noted in the earlier discussion, the differences exceed levels that have been used by Courts in actions under the Lanham Act.

The results of the surveys make clear that the Aaronson Web pages communicate to a substantial number of consumers that Aaronson can assist them with cancellation of their

---

[17] Wayne D. Hoyer, Deborah J. MacInnis, and Rik Pieters (2013), *Consumer Behavior*, Sixth Edition, (Mason, OH: South-Western), p.136.

timeshare property contract. In addition, the Aaronson Web site pages have the effect of diminishing the perception of timeshare companies among a substantial number of consumers and suggest to a substantial number of consumers that many timeshare property companies are engaged in unlawful practices. Finally, the Aaronson Web site pages say or suggest to a substantial number of consumers that they can get out of their timeshare property contract for any reason. Because the results regarding what the material communicated among respondents who saw the Aaronson differ from the results obtained from respondents who saw a control letter, the results cannot be explained by respondents' pre-existing beliefs. Rather, the Aaronson Web site pages are the cause of the beliefs expressed by a substantial number of respondents.

As noted earlier in this report, the results of the survey are most likely to underestimate the effect of the Aaronson web site pages on visitors to these sites. This is because the results are based on a single exposure to the content of the Aaronson Web site pages. Repeat visits and other forms of communications with similar content will likely have a stronger effect than what has been identified in this survey. As discussed earlier, the reason for this is the well-known importance of frequency, or repetition, in attracting greater attention, in facilitating memory of content, and prompting action on the part of the recipient of advertising.

In addition, the control used in the present study very likely over-estimates the degree to which the control communicates misleading and/or disparaging information because some responses to the questions among respondents who saw the control were likely influenced by prior exposure to other misleading and disparaging information in the market. It is certainly the case that the estimates for the percentages of respondents who took away misleading or disparaging messages are lower bounds of what is likely to be found in the larger market among consumers exposed to these messages.

Finally, three items examined in the survey make clear that many respondents, and the consumers they represent, are likely to act on information that suggests they can stop making or withhold payments on their time share properties and that they would be likely to retain the law firm if there was a high probability that their timeshare developer was exposed legally in ways that are relatively straight-forward and provable.

Taken as a whole, the results reported here provide strong evidence that the Aaronson Web site pages mislead a substantial number of consumers regarding the services offered by Aaronson, communicate disparaging information to a substantial number of consumers, and will cause a substantial number of consumers to take action based on such misleading and disparaging information.

Executed this 6th day of September, 2018 at Leeds, United Kingdom.


_____

David W. Stewart, Ph.D.

**EXHIBITS**

**Exhibit 1 – Curriculum Vitae**

**Exhibit 2 – ResearchNow Consumer Internet Panel**

**Exhibit 3 – Aaronson Web Page 1**

**Exhibit 4 – Exhibit 3 – Aaronson Web Page 2**

**Exhibit 5 – Aaronson Web Page 3**

**Exhibit 6 – Control Letter**

**Exhibit 7a – Screen Shots of Test Questionnaire**

**Exhibit 7b – Screen Shots of Control Questionnaire**

**Exhibit 8 – Codebook for Verbatim Responses**

**Exhibit 9 - Summary Tabulations of Test Survey Results**

**Exhibit 10 – Summary Tabulations of Control Survey Results**