UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DIAMOND RESORTS
INTERNATIONAL, INC.; DIAMOND
RESORTS U.S. COLLECTION
DEVELOPMENT, LLC; DIAMOND
RESORTS HAWAII COLLECTION
DEVELOPMENT, LLC; DIAMOND
RESORTS MANAGEMENT, INC.,

     Plaintiffs,

v.                                                  Case No. 6:17-cv-1394-Orl-37DCI

AUSTIN N. AARONSON; and
AARONSON, AUSTIN, PA.,

     Defendants.

_____

## <u>ORDER</u>

Plaintiffs Diamond Resorts International, Inc., Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Collection Development, LLC, and Diamond Resorts Management, Inc. (collectively, "**Diamond**") sued Defendants Austin N. Aaronson ("**Mr. Aaronson**") and Aaronson, Austin, PA ("**Aaronson Law Firm**") (collectively, "**Defendants**") for claims arising from advertisements on the Aaronson Law Firm website ("**Firm Website**") and Mr. Aaronson's representation of clients who are or were Diamond members ("**Diamond Clients**"). (*See* Docs. 1, 47.) Defendants moved for summary judgment on all claims (Doc. 115 ("**Motion**")), and Diamond opposed (Doc. 133). The Motion is due to be denied.

## I.   BACKGROUND[1]

Diamond consists of Las Vegas-based timeshare developers managing over 420 membership resorts worldwide. (Doc. 47, ¶¶ 1, 17–24.) Defendants are an Orlando-based attorney and his law firm focused on soliciting Diamond's and other developers' timeshare members to become clients to free them from financial obligations under their timeshare purchase and financing contracts ("**Timeshare Contracts**"). (*Id.* ¶¶ 14, 15, 25.) To induce Diamond members to hire Defendants, Diamond alleges that Defendants put out false advertisements ("**Subject Advertisements**") that lead Diamond members to believe they can get out of their Timeshare Contracts. (*Id.* ¶¶ 2, 26, 29, 32–53.) Thus, timeshare members have ceased payments under their Timeshare Contracts, and occasionally Diamond faced baseless arbitration proceedings. (*Id.* ¶¶ 4, 31, 37, 39–53.) The Court discusses the Subject Advertisements before turning to Defendants' representation of Diamond Clients.

### A.   The Subject Advertisements

The Subject Advertisements that Diamond claims are false and misleading all appear or have appeared on the Firm Website in text on webpages, articles, blogs, and videos. (*See, e.g.*, Doc. 133-5.) One advertisement touting Defendants' approach to timeshare cancellation appeared on the Firm Website's homepage ("**Homepage**") from

---

[1] The facts recited here may not be the "actual" facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect Plaintiff's "best case"—the Court must consider the facts in the light most favorable to Plaintiff as the nonmoving party. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see also Walker v. City of Riviera Beach*, 212 F. App'x 835, 837 (11th Cir. 2006).

August 2015 until August 2016:

> Timeshare ownership often feels like entrapment. How do we know this?
> Because people tell us. Their stories are remarkably consistent.
> . . . .
>
> But reciting this disturbing series of events is not going to help legally.
> Why? Because it's your word against there's [sic]. Plus, there are a thousand
> disclaimers and waivers in those closing documents, enough to absolve the
> developer of almost anything.
>
> But that's not to say that you don't have any leverage, any cards to play. At
> the Aaronson Firm, we focus on other ways to release your obligation. One
> in particular: Maintenance. Your developer has a fiduciary duty to manage
> the resorts in your best interest. Chances are, they're in breach of that duty,
> in ways that are very obvious and easy to prove.
>
> This is where the developer is most vulnerable. This is where your leverage
> is. And you owe it to yourself to hire experienced, competent counsel. At
> the Aaronson Firm, we have over forty years of combined legal experience.
> And we are willing to sue, if necessary, in the interest of getting you
> released.
>
> So call us free of charge to discuss your situation, please. Your legal
> problems are not insurmountable.

(Doc. 133-5, pp. 1, 4; *see also* Doc. 133-4, pp. 65–66.) This language changed later in 2016:

> But the chances are good that your timeshare developer is exposed legally
> in ways that are relatively straightforward and provable. And you owe it to
> yourself to hire experienced, competent counsel. At the Aaronson Firm, we
> have over forty years of combined legal experience. And we are willing to
> sue, if necessary, in the interest of getting you released.
>
> So call us free of charge to discuss your situation, please. Your legal
> problems are not insurmountable. If you are looking to cancel your
> timeshare Aaronson Law Group can help.

(Doc. 133-5, pp. 1, 5.) In 2017 and 2018, the language changed again:

> But chances are good that your timeshare developer is exposed legally in
> ways that are relatively straightforward and provable. You owe it to
> yourself to hire experienced, competent counsel. At the Aaronson Law

Firm, we have over 80 years of combined legal experience. And we are willing to sue, if necessary, in the interest of getting your timeshare cancelled.

So please contact us using one of our three convenient methods to receive a free consultation to discuss your situation. You can:

1. Call us free of charge,
2. Use our Contact Form above, or
3. Live Chat with a person ready to assist you.

YOUR LEGAL PROBLEMS ARE NOT INSURMOUNTABLE!

If you need to cancel your timeshare, the Attorneys of the Aaronson Law Firm stand ready and able to help you!

(*Id.* at 2, 6–7.)

Another advertisement appeared on the Firm Website's "How It Works" page. In early 2016, that page read:

Quite often, one's signature on a timeshare contract is obtained by fraud. And the debt that it creates generally outweighs any benefit to the owner. But to address it properly, it is imperative that you retain a licensed attorney.
. . . .

But experienced, competent counsel will know how to exploit other points of vulnerability. For example, the developer may well be perpetrating an ongoing conflict of interest. Improper handling of trust funds are [sic] also a major issue.

This is where the developer is most vulnerable. This is where your leverage is. And by far the best way to leverage this is through a licensed attorney, who will have subpoena power over books and records.

So call us free of charge to discuss your situation, please. Your problems are not insurmountable.

(*Id.* at 2, 8.) The "How It Works" page updated later to include a diagram of the Aaronson Law Firm's process of getting individuals out of their Timeshare Contracts. (*Id.* at 2, 9.)

The language from the Homepage and "How It Works" page also appears in videos on the Firm Website in which a man wearing a gray suit recites the same information. (Doc. 132, ¶ 4 (video available from August 2015 to August 2016); *id.* ¶ 5 (current video).)

These advertisements generally espouse Defendants' view of common practices of the timeshare industry as a whole. (*See* Doc. 133-5.) But other advertisements on the Firm Website discuss Diamond specifically. (*See* Docs. 133-23, 133-24.) An example is the "article" entitled "Timeshare Traps" dated May 5, 2015:

> Diamond Resorts International, Inc., is an incredibly profitable company. They are also publicly traded, so that one can gain a certain amount of insight into how they operate. And they appear willing to stop at nothing to maintain this profitability.
>
> Diamond's modus operandi recently has not been about building new resort facilities. Rather, it is inclined to acquire existing facilities from previous developers, many of which were set up on the deed system. In some cases, these resorts were substantially sold out to deeded owners. Undeterred, Diamond has then endeavored to 'revoke' the deeds, a unilateral act utterly without legal authority, and impose a 'points' system conferring greater access based upon amount of points purchased.
>
> In this fashion, Diamond can accomplish several things that it could not do otherwise: 1. It can again commence the sale of new timeshare interests without having to build new facilities; 2. It can do so without recording deeds in public records, which was a public disclosure substantially impeding it from overbooking resorts. This practice is incredibly unfair to owners of existing interests in these resorts, deeded or otherwise.
>
> So don't be too surprised if, next time you try to book your vacation, you are told that you have insufficient points to access any of the accommodations, and that you'll have to buy more.
>
> If you are disappointed with your Diamond timeshare, please don't hesitate to call us concerning your legal options, including rescission of the contract, free of charge.

(Doc. 133-23.) Another targeted advertisement appeared on the "Diamond Resorts

Timeshare Cancellation" page:

> Rescinding your Diamond Resorts International Timeshare Contract
>
> Unlike some other timeshare developers, Diamond Resorts International has never been a 'hotelier' per se.
>
> Why are timeshares often more profitable than hotels? Simply that selling you space in their facilities is more profitable than renting them to you, for several reasons:
>
> 1. It creates a more predictable cash flow
> 2. They can still rent the same facilities as a hotel if they're not fully booked
> 3. On the 'points' system, they can overbook, and deny you access on the basis that you don't have enough of them. (No one said that any of this is necessarily lawful)
> 4. They can just plain charge you more money. (See our blog on the 'true cost of a timeshare').
>
> If you've been hoodwinked into 'purchasing' your vacation, please feel free to contact us.

(Doc. 133-24.)

> Last, this blog post titled "Timeshare Conflict of Interest":
>
> Simply put, a conflict of interest exists when one's duty to act in your best interest is compromised by some other factor, typically money. In the case of Diamond Resorts International, such a conflict is evident in every aspect of what they do, particularly in the management of their resorts.
>
> Here's what we mean: You, as an owner of a timeshare, have certain rights, particularly voting rights, in association with the election of condominium association board members, which in turn make decisions concerning the management of the timeshare. Of these decisions, the most significant is the appointment of a professional 'management' company to maintain the facilities.
> . . . .
>
> But with DRI, that's not exactly how it works. Rather, Diamond will invariably install *itself* as the management company running its resorts, even though it lacks a majority ownership interest in any given resort that would legally qualify it to do so. How can this be, you ask? If they don't

own most of the units, they can't even control the vote. By what legal authority can they do anything at all to control the management of the resort?

Here is their rationale, taken from language contained in [the] most recent annual report . . . filed with the S.E.C.:

> *HOAs. Each of the Diamond Resorts managed resorts, other than certain resorts in the European Collection, is typically operated through an HOA, which is administered by a board of directors. Directors are elected by the owners of intervals at the resort (which may include one or more of the Collections) and may also include representatives appointed by the Company as the developer of the resort. As a result, the Company is entitled to voting rights with respect to directors of a given HOA by virtue of (i) its ownership of intervals at the related resort, (ii) its control of the Collections that hold intervals at the resort and/or (iii) its status as the developer of the resort. The board of directors of each HOA hires a management company to provide the services described above, which in the case of all Diamond Resorts managed resorts, is the Company. The Company functions as an HOA for two resorts in St. Maarten, collects maintenance fees, earns management fees and incurs operating expenses at these two resorts.*

Almost every statement in the foregoing 'rationale' is a non-sequitur. The disclosure makes a statement that the directors are elected by interval owners, which is an accurate statement of how things are supposed to work. But it then goes on to say that "As a result, the Company (Diamond) is entitled to voting rights with respect to directors of a given HOA . . ." Stop right there. The fact that the owners elect directors does not entitle Diamond to 'voting rights' except to the limited extent to which it actually has title to intervals in the resort. On information and belief, in no case does Diamond actually own a majority of intervals in any resort that they manage. But it get[s] better: In trying to explain the legal basis for its control of the resorts, the disclosure goes on to say that it's ". . . [because] i. its ownership of intervals at the related resort" (duly noted and refuted) . . . [and] ii. its control of the Collections that hold intervals at the resort and/or . . . (so it's [sic] control of the *management* company gives it the right to control the *board of directors* — not *vice versa*????? . . . [and] iii. its status as the *developer* of the resort". So the *developer*, not the *owners*, of a resort now has status to forever control the board of directors. Maybe they can cite some legal authority for that one.

In practice, what happens is this: Diamond will endeavor to circulate a number of 'proxy' proposals binding your vote as an owner to elect one of their insiders to the board. This they can do, even with ownership of a single interval. Invariably Diamond's stooges will then appoint Diamond's "U.S. Collections" arm to manage the resort.

Unlike Diamond, you the owner of a resort interval are 'out of the loop'. You don't have a roster of other owners, and thus no way to communicate with them. Thus, there is no[ ] way to galvanize opposition to the status quo. And the cycle repeats itself year after year.

If any of this resonates with you, please call free of charge. We will discuss your legal options.

(Doc. 132-2.) This post has been on the Firm Website since 2015. (Doc. 132, ¶ 3.)

From January 1, 2013 to August 22, 2018, the Homepage had 69,027 visits, the "How It Works" page 12,923 visits, and the "Diamond Resorts Timeshare Cancellation" page 3,330 visits. (*See* Doc. 133-7.)

### B.    Defendants' Representation of Diamond Clients

About 258 Diamond timeshare owners have retained Defendants to cancel their Timeshare Contracts. (Doc. 133, ¶ 19; Doc. 133-1; Doc. 115-2, p. 8.) Diamond members find Defendants in various ways, including through internet searches, the Firm Website, online forums, and referrals from other individuals. (Doc. 115-5, pp. 34–40.) For about eighty of Defendants' client matters involving Diamond members, the Diamond members became clients through the Firm Website. (*See* Doc. 133-9.) And almost half of Defendants' Diamond Clients have delinquent Diamond accounts based on the members' failure to pay money owed under their Timeshare Contracts, including mortgage payments, interest payments, and maintenance or other fees.[2] (Doc. 133, ¶ 2; Doc. 115-2, p. 8; Doc. 115-15, pp. 9–10.) According to Diamond, as of July 31, 2018 these delinquencies totaled $ 4,578,838. (Doc. 115-15, p. 15.)

---

[2] These Diamond accounts became delinquent at various times relative to retaining Defendants—some before and some after. (See Doc. 115-5, pp. 1–15.)

In representing Diamond Clients, Defendants have started over thirty arbitrations against Diamond asserting claims for breach of fiduciary duty, conflicts of interest, and mishandling and misappropriation of maintenance fees—consistent with the allegations in the Subject Advertisements. (*See* Doc. 133-13.) Yet no arbitrations provided relief in Defendants' clients' favor on those asserted claims.[3] (*See* Docs. 115-5, 115-6; *see also* Doc. 133-14.) Multiple times, the arbitrator found that the claims lacked good faith. (Doc. 115-5, pp. 11, 14, 34, 45, 62.) And in some, the arbitrator ruled in Diamond's favor on counterclaims for breach of the Timeshare Contracts over Defendants' clients' failure to make payments on their promissory notes. (Doc. 115-5, pp. 11–18, 32, 37, 44–45, 62; Doc. 115-6, pp. 83, 95, 134–35.) The Court highlights two Diamond Clients' stories to illustrate Defendants' approach to representation.

### 1.    The Hardistys

First, the Court addresses the experience of Ms. Hardisty, who purchased Diamond timeshare points for the first time in July 2015. (Doc. 115-19, pp. 11, 16, 29, 143.) After purchasing additional points in November 2015, she had second thoughts because she could not afford the payments and felt she had been lied to by Diamond. (*Id.* at 53–56, 61–64, 79, 100–01). This led her to conduct an internet search on how, if at all, she could get out of the Timeshare Contract. (*Id.*) There, she came across Mr. Aaronson's name. (*Id.*) She clicked on the Firm Website and watched the video "talking about

---

[3] But that is not to say Defendants never prevailed on behalf of their Diamond Clients based on other claims, including fraud in the inducement and misrepresentations made by Diamond. (*See, e.g.*, Doc. 115-3; Doc. 115-6, pp. 1–10, 136–37; Doc. 115-4.)

maintenance fees, how [Mr. Aaronson] can get you out of your timeshare, that kind of thing." (*Id.* at 56.) The information in the video was the same as that in the Subject Advertisements. (*Id.* at 85–86.) While on the Firm Website, she submitted information about her situation and live chatted someone from the Aaronson Law Firm who gave her information about the process. (*Id.* at 56, 64, 100.) Following this online exchange, the Hardistys retained Mr. Aaronson. (*Id.* at 64–65.)

During his representation of the Hardistys, Mr. Aaronson sent a demand letter to Diamond and began arbitration proceedings against Diamond. (*See id.* at 116–25.) But according to Ms. Hardisty, the claims Mr. Aaronson filed did not reflect her perception of Diamond's wrongdoing. (*Id.* at 116–25, 129–43.)  The claims in the letter and the statement of claim included claims for breach of fiduciary duty, violation of Nevada statutes, fraud in the inducement, conversion, quantum meruit, and rescission and an allegation that Diamond had misappropriated funds. (*See* Doc. 133-13, pp. 1–24.) Yet Ms. Hardisty found some facts asserted to be untrue, and she didn't even know what some claims meant. (Doc. 115-19, pp. 116–25, 129–43.) Plus, none of the asserted claims seemed "obvious" or "easy to prove" as marketed by Defendants. (*Id.* at 128, 150.) And when Ms. Hardisty asked Mr. Aaronson for his advice about continuing to pay Diamond, he told her she "could probably stop paying them." (*Id.* at 144, 154.) Perceiving this "advice" as permission, she ceased making payments. (*Id.*) Mr. Aaronson then terminated his representation before the arbitration hearing took place. (*Id.* at 65, 138, 146.)

### ii.   The Feldmans

Second are the Feldmans. They bought Diamond timeshare points for the first time

in 2014. (Doc. 115-20, p. 40.) After Diamond increased their maintenance fees following their purchase of additional points in May 2015, they wanted to terminate their Timeshare Contract. (*Id.* at 45–51.) So Mr. Feldman looked for attorneys. (*Id.* at 52, 55.) He found Mr. Aaronson online and watched "a video [on his website] that seemed okay." (*Id.* at 52, 55, 91–92.) He then reviewed the Firm Website and looked into whether Mr. Aaronson had any malpractice or disciplinary issues from the Florida Bar. (*Id.* at 52–56.) Finding none, Mr. Feldman called Mr. Aaronson because he was the only attorney he could find. (*Id.*) Mr. Feldman found Mr. Aaronson to be "positive about being able to help," so Mr. Feldman retained him. (*Id.* at 57–58, 93.) And although Mr. Aaronson made no guarantee about the outcome, according to Mr. Feldman, "[h]e was pretty certain" he could deliver. (*Id.* at 76–77.)

Near the beginning of the representation, Mr. Feldman expressed that he did not want to keep paying Diamond. (*Id.* at 115.) Mr. Aaronson responded by telling him that "it would not be to [his] benefit to make any more payments." (*Id.* at 115, 123.) Mr. Feldman said they "were instructed to stop payment on the promissory note"—"[Mr. Aaronson] agreed that we shouldn't continue the note payment." (*Id.* at 115–16, 124–25.) Mr. Aaronson later sent a demand letter to Diamond and filed a statement of claim on behalf of the Feldmans. (*Id.* at 98–115.) The claims Mr. Aaronson asserted were almost identical to the claims he asserted for the Hardistys. (*See* Doc. 133-13, pp. 141–47.) According to Mr. Feldman, the statement contained information he did not understand and other information he did not find accurate or know about. (Doc. 115-20, pp. 98–115.) Mr. Aaronson then represented the Feldmans during an arbitration hearing against

-11-

Diamond, where Mr. Feldman testified about the misrepresentations made by the Diamond salespeople. (*Id.* at 77–79.) Ultimately, the Feldmans did not prevail. (*Id.* at 81–82, 102.) Diamond counter-sued for their unpaid contract. (*Id.*) Mr. Feldman felt that the claims raised by Mr. Aaronson—based on maintenance fees, breaches of fiduciary duty, and conflicts of interest—were not obvious and easy to prove. (*Id.* at 121.) They retained a different lawyer to settle the outstanding amounts owed to Diamond. (*Id.* at 83, 113.)

### C.     The Instant Action

Based on the Subject Advertisements and Defendants' representation of Diamond Clients—both of which Diamond contends caused harm to Diamond's reputation and sales—Diamond sued. (*See* Doc. 1.) Following the Court's ruling on Defendants' motion to dismiss (*see* Doc. 43), Diamond amended its complaint to allege: **Count I**, false advertising in violation of the Lanham Act; **Count II**, tortious interference with contractual relations; **Count III**, trade libel; and **Count IV**, violations of Florida's Deceptive and Unfair Trade Practices Act ("**FDUTPA**"). (*See* Doc. 47.) Now Defendants move for summary judgment, contending that neither the Subject Advertisements nor Mr. Aaronson's conduct during representation of Diamond Clients is unlawful. (Doc. 115.) Briefing complete (*see* Docs. 133, 138), the matter is ripe.

## II.     LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows there is "no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On issues for which the movant has the burden at trial, it must show the absence of a genuine issue of material

fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on the essential elements. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys.*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

On issues for which the nonmovant would bear the burden of proof the movant has two options: (1) it may simply point out a lack of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), so that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). Yet "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   ANALYSIS

Defendants seek summary judgment on all four Counts. (*See* Doc. 115.) As for Count I, Defendants argue: (1) Diamond lacks what they call "statutory standing" to bring a claim under the Lanham Act; and (2) even if it had standing, Diamond cannot prove a false advertising claim.[4] (*Id.* at 5–19.) As for Counts II–IV, Defendants contend that the Florida Litigation Privilege bars Diamond's reliance on any statements or acts in earlier arbitration proceedings to prove these claims and that Diamond cannot establish those claims. (*Id.* at 19–24.) Diamond counters there are genuine issues of material fact to preclude summary judgment and warrant a jury trial. (*See* Doc. 133.) The Court begins with the Lanham Act claim and then turns to the Florida law claims.

### A.   Count I: Lanham Act

In addressing Diamond's Lanham Act claim, Defendants first assert that Diamond does not have "statutory standing" to pursue this claim. (Doc. 115, pp. 5–9.) Defendants

---

[4] Defendants' "statutory standing" label does not apply. As the Supreme Court said in *Lexmark*, which Defendants rely on to support their argument, "We have on occasion referred to this inquiry as 'statutory standing' and treated it as effectively jurisdictional. That label is an improvement over the language of 'prudential standing,' since it correctly places the focus on the statute. But it, too, is misleading, since 'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction . . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (citations omitted).

then argue that even if Diamond had "statutory standing," Diamond has failed to show that (1) the Subject Advertisements are false or misleading; (2) the Subject Advertisements deceived anyone in the target audience; and (3) the Subject Advertisements had any material effect on consumers' purchasing decisions. (*Id.* at 9–17.) But viewing the evidence and all reasonable inferences from the evidence in the light most favorable to Diamond, the Court finds that genuine issues of material fact exist on the Lanham Act claim so that summary judgment must be denied.[5]

> Under the Lanham Act:
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Protection under § 1125(a) "extends only to plaintiffs whose interests 'fall within the zone of interests protected by'" the Lanham Act. *Lexmark Int'l, Inc. v. Static*

---

[5] Defendants first assert a "statutory standing" argument as to the Lanham Act claim—whether Diamond falls within the "zone of interests" and whether the Subject Advertisements proximately caused Diamond's alleged injuries. (Doc. 115, pp. 5–19.) This arrangement puts the cart before the horse. As part of this "statutory standing" analysis requires determining whether the false or misleading advertisements proximately caused the plaintiff's injury, the Court starts with whether the advertisements are false or misleading before analyzing the proximate causation prong of "statutory standing." *See Lexmark Int'l*, 572 U.S. at 140.

*Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). This means that "a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 140. To establish that the defendant's misrepresentations caused the injury:

> the plaintiff must show: "(1) the . . . statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumer's purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement."

*Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (alteration in original) (quoting *Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers*, 702 F.3d 1279, 1294 (11th Cir. 2012)). The Court starts with the "zone of interests" inquiry.[6]

### 1.    Zone of Interests

The first question for the Court is whether Diamond's asserted injuries—reputational harm and damages from lost sales (*see* Doc. 47, ¶¶ 58–64)—fall within the Lanham Act's "zone of interests." Section 1125(a) "authorizes suit by 'any person who believes that he or she is likely to be damaged' by a defendant's false advertising.'" *Lexmark Int'l*, 572 U.S. at 129 (quoting § 1125(a)). "[T]o come within the zone of interests

---

[6] Defendants don't argue causation by way of these five enumerated elements of a false advertising claim. (*See* Doc. 115.) Rather, they argue causation before addressing any of these elements. (*See id.*) Defendants also don't argue the merits of all five enumerated elements, so the Court confines this Order to the what Defendants argue.

in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32; *see also id.* at 137 (finding that the Lanham Act protects against injuries to lost sales and damage to business reputation).

Defendants first contend that because Diamond is no longer seeking damages for reputational harm, that asserted harm cannot be a way for Diamond to come within the "zone of interests." (Doc. 115, pp. 5–7.)  But Diamond maintains that false accusations in the Subject Advertisements alleging Diamond's engagement in conflicts of interest and other unlawful activities show that Diamond has suffered reputational harm—even if Diamond isn't seeking monetary damages for this harm. (Doc. 133, pp. 9–10.) Given the Subject Advertisements, particularly those targeted at Diamond, the Court finds that a reasonable jury could find that any false accusations in the Subject Advertisements have harmed Diamond's reputation. *Cf. Lexmark Int'l*, 572 U.S. at 138 (stating that a false advertising claim may arise "[w]hen a defendant harms a plaintiff's reputation by casting aspersions on its business").

Defendants next argue, without support, that Diamond's claimed monetary losses—unpaid promissory notes and maintenance fee obligations—aren't covered by the Lanham Act as they represent an interest in "accounts receivables," not lost sales. (Doc. 115, pp. 6–7.) Yet Diamond contends that it has suffered monetary damages from unpaid obligations Diamond members contracted to pay Diamond in exchange for points, which also constitutes a loss of customers associated with these delinquent timeshare accounts. (Doc. 133, pp. 9–11.) As support, Diamond submitted a report from a damages expert, who opined these monetary losses from these delinquent payments amount to over $4.5

million. (*See* Doc. 115-15, pp. 15, 47–65.) Defendants make the unsupported contention these monetary losses aren't covered by the Lanham Act as they represent only an interest in "accounts receivables." (*See* Doc. 115, pp. 6–7). Absent authority to the contrary, the Court finds these unpaid obligations, coupled with the lost customers associated with these unpaid obligations, constitute "lost sales" that are a sufficient harm to maintain this false advertising claim.[7] (*See* Doc. 43, pp. 7–8 (rejecting this zone of interests argument in the motion to dismiss).)

The Court finds that Diamond's claimed injuries from damage to its business reputation and lost sales in the form of unpaid promissory notes and other fees—and the evidence it has presented to support those injuries at this stage (*see* Doc. 115-15)—place Diamond within the Lanham Act's § 1125(a) zone of interests. *See Lexmark Int'l*, 572 U.S. at 137 (finding that the plaintiff's "alleged injuries—lost sales and damage to its business reputation—are injuries to precisely the sorts of commercial interests the [Lanham] Act protects").

### 2.      False or Misleading Statements

Next, the Court turns to the enumerated elements of the false advertising claim itself. "The first element of a false advertising claim is 'satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but

---

[7] Defendants also argue that "Diamond has abandoned any claim to lost sales and market share by refusing to allow discovery of any information that would allow Defendants an opportunity to quantify or dispute such claims." (Doc. 115, p. 6.) Diamond counters that it did produce financial and other necessary documents. (Doc. 133, p. 9.) As a result, the Court finds Diamond has not abandoned its claim to lost sales—particularly given the evidence from Diamond's damages expert. (*See* Doc. 115-15.)

misleading.'" *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (quoting

*Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir.

2002)). To determine whether an advertisement is false or misleading, a court "must

analyze the message conveyed in full context" and "view the face of the statement in its

entirety." *Id.* (quoting *Johnson & Johnson*, 299 F.3d at 1248). And although "[s]tatements of

opinion are generally not actionable," a statement of opinion may be actionable if it

"fairly implies a [factual] basis." *Duty Free Americas*, 797 F.3d at 1277 (alteration in

original) (quoting *Osmose*, 612 F.3d at 1311).

The Subject Advertisements appear or have appeared on the Firm Website: the text

on the Homepage, the statements in the videos embedded on the Homepage, the text on

the "How It Works" page, articles, and blogs. *See supra* Section II.A. Starting with the

Homepage, the text first stated:

> But that's not to say that you don't have any leverage, any cards to play. At
> the Aaronson Firm, we focus on other ways to release your obligation. One
> in particular: Maintenance. Your developer has a fiduciary duty to manage
> the resorts in your best interest. Chances are, they're in breach of that duty,
> in ways that are very obvious and easy to prove.

(Doc. 133-5, p. 4.) It was modified later to say: "chances are good that your timeshare

developer is exposed legally in ways that are relatively straightforward and provable."

(Doc. 133-5, pp. 6–7.) Defendants' "How It Works" page also identified Defendants'

approach to other vulnerabilities of timeshare developers: "But experienced, competent

counsel will know how to exploit other points of vulnerability. For example, the

developer may well be perpetrating an ongoing conflict of interest. Improper handling of

trust funds are [sic] also a major issue. This is where the developer is most vulnerable.

-19-

This is where your leverage is." (Doc. 133-5, p. 8.) Upon review, the Court finds that each advertisement claims that timeshare developers are vulnerable and exposed legally, such as by breaching fiduciary duties in handling maintenance of timeshare properties and perpetuating conflicts of interest. They also communicate that, as a result, there are obvious and provable ways for individuals to get out of their Timeshare Contracts.

The Subject Advertisements also attack Diamond specifically. "Timeshare Traps" accuses Diamond of "endeavor[ing] to 'revoke' . . . deeds, a unilateral act utterly without legal authority, and impose a 'points' system conferring greater access based upon amount of points purchased." (Doc. 133-23.) In "Diamond Resorts Timeshare Cancellation," Defendants question the legality of Diamond's points system—noting that "[i]f you've been hoodwinked into 'purchasing' your vacation, please feel free to contact us." (Doc. 133-24.) And in the "Timeshare Conflict of Interest" blog, Defendants assert that Diamond perpetuates a conflict of interest and acts without legal authority in controlling the management of its resorts. (Doc. 132-2.) Examining each advertisement in its entirety, a message conveyed is that Diamond is engaging in unlawful activity and that readers should contact Defendants to discuss legal options about what they can do about it.

Defendants seek to sidestep Diamond's claim that the Subject Advertisements are false and misleading by claiming that some advertisements are accurate and by labeling the others as merely "opinion." (Doc. 115, pp. 10–13.) The Court is unpersuaded. As it stands, genuine issues of material fact exist about whether the Subject Advertisements are "literally false" or "literally true but misleading." This is in part because the record

belies Defendants' claimed messages that vulnerabilities in the Timeshare Contracts exist
that are obvious and easy to prove due to timeshare developers' practices. For example,
the record reveals that Defendants asserted the specific "easily provable" claims
identified in the Subject Advertisements against Diamond in over thirty cases—but lost
on those claims every time. (*See* Docs. 115-5, 115-6, 133-13, 133-14; *see also* Doc. 133-5, pp.
4–9.[8]) What is more, the record reveals that Mr. Aaronson could not sufficiently answer
questions about how he could prove these "provable" claims or any of his accusations
against Diamond—and his methods were never accepted by a judge or arbitrator.[9] (*See*
Doc. 133-4, pp.77–78, 90–104, 127–131, 151–56; Doc. 133-15, pp. 178–208, 220–32.)

Beyond this, Defendants' claim that select phrases and statements are opinion, and
not actionable, fails when the Court, as it must, views each Subject Advertisement in its
full context. Although Defendants use equivocal phrases about timeshare developers'
potential unlawful conduct such as "chances are" and "may well be," the Subject
Advertisements also contain more direct, unequivocal statements about the same
conduct—even calling on readers to respond. (*See, e.g.,* Doc. 133-5 (stating "[t]his is where

---

[8] Although Defendants submitted arbitration awards as exhibits to their Motion
(*see* Docs. 115-4, 115-6), Defendants argued in their reply that all arbitration awards are
inadmissible hearsay (*see* Doc. 138, p. 10 n.7). The Court disagrees with such a blanket
assertion of hearsay. For example, to the extent Diamond offers these arbitration awards
to show not the content of the awards but to prove Mr. Aaronson's understanding of his
asserted claims as easy, obvious, and provable, the arbitration awards would not be
hearsay. As records generated in a quasi-judicial proceeding, they may be exempt under
Fed. R. Evid. 803(6) or 803(8). And finally, the Court finds these records would be
admissible under the Residual Exception. *See* Fed. R. Evid. 807.

[9] Defendants' Diamond Clients also had no idea how Mr. Aaronson intended to
prove these claims or any evidence he had to support them. (*See* Doc. 133-22, pp. 73–79;
*see also* Doc. 115–19, pp. 128, 150; Doc. 115-20, pp. 98–115, 121.)

the developer is most vulnerable," "[t]his is where your leverage is," "experienced, competent counsel will know how to exploit other points of vulnerability," and "you owe it to yourself to hire experienced, competent counsel").) The Subject Advertisements also directly challenge the legality of Diamond's conduct, stating "By what legal authority can they do anything at all to control the management of the resort?"; "maybe they can cite some legal authority for that one"; and "No one said that any of this is necessarily lawful." (*See* Docs. 132-2, 133-24.) Some of these then end by inviting readers to call to discuss legal options. (*See id.*) So while there may be individual statements or phrases in the Subject Advertisements that are undeniably opinions or partly true, the Court finds that each Subject Advertisement also conveys a factual basis, not solely opinion.

With this, the Court simply cannot agree with Defendants that a reasonable jury would find that the Subject Advertisements are mere assertions of opinion or suggestion. Let's not forget these advertisements are authored by a lawyer and appear on his law firm's website—a firm dedicated to timeshare cancellation. (*See, e.g.*, Doc. 133-5.) They also directly accuse Diamond and other timeshare developers of committing fraud, perpetuating conflicts of interests, breaching fiduciary duties, and other unlawful activity. (*See id.* at 4–8; *see also* Docs. 133-23, 133-24.) In them, Defendants represent themselves as "experienced, competent counsel" and contend there are "obvious" and "easy to prove" claims that can be raised against timeshare developers. (*See* Doc. 133-5, pp. 4–6.) And finally, the Subject Advertisements call on readers to contact Defendants immediately for a free consultation, with an assurance that their legal problems are not insurmountable. (*See, e.g.*, *id.*) Against this backdrop, the Court cannot find that no

genuine issues of material fact exist on the false and misleading nature of the Subject Advertisements.

### 3. Level of Deception

Next, the Court tackles the second enumerated element: that the statements are deceptive. To have relief on a false advertising claim, the plaintiff must show that "the statements deceived, or had the capacity to deceive, consumers." *Sovereign Military Hospitaller Order*, 702 F.3d at 1294. "The classification of an advertisement as literally false or true but misleading affects the [plaintiff's] burden with respect to the element of consumer deception." *Osmose*, 612 F.3d at 1318–19. If an advertisement is literally false, there is no requirement to present evidence of consumer deception. *Id.* But if an advertisement is merely misleading, then evidence must exist. *Id.* at 1319 (citing *Johnson & Johnson*, 299 F.3d at 1247). Evidence of deception must be "in the form of consumer surveys, market research, expert testimony, or other evidence." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004) (citing *Johnson & Johnson*, 299 F.3d at 1247). And "[c]onsumer survey research often is a key part of a Lanham Act claim alleging that an advertisement is misleading or deceptive." *Id.* (citing *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992)).

The evidence Diamond proffered as evidence of deception is the report by Dr. Stewart, a consumer behavior expert, about his surveys to analyze the effect of the Subject Advertisements on viewers who are or were timeshare owners. (*See* Doc. 115-13 ("**Stewart Survey Report**").) In synthesizing the results of the surveys, Dr. Stewart concluded:

-23-

The surveys . . . produce[ ] a pattern of responses that provides compelling evidence that the Aaronson websites communicate misleading information about the services provided by Aaronson and disparaging content about time share management companies. Across multiple items there are statistically significant differences between the responses offered by survey participants who saw one of the Aaronson websites and a control letter. In addition . . . the differences exceed levels that have been used by Courts in actions under the Lanham Act.

The results of the surveys make clear that the Aaronson Web pages communicate to a substantial number of consumers that Aaronson can assist them with cancellation of their timeshare property contract. In addition, the Aaronson Web site pages have the effect of diminishing the perception of timeshare companies among a substantial number of consumers and suggest to a substantial number of consumers that many timeshare property companies are engaged in unlawful practices. Finally, the Aaronson Web site pages say or suggest to a substantial number of consumers that they can get out of their timeshare property contract for any reason. Because the results regarding what the material communicated among respondents who saw the Aaronson [Web site pages] differ from the results obtained from respondents who saw a control letter, the results cannot be explained by respondents' pre-existing beliefs. Rather, the Aaronson Web site pages are the cause of the beliefs expressed by a substantial number of respondents.

. . . .

Finally, three items examined in the survey make clear that many respondents, and the consumers they represent, are likely to act on information that suggests they can stop making or withhold payments on their time share properties and that they would be likely to retain the law firm if there was a high probability that their timeshare developer was exposed legally in ways that are relatively straight-forward and provable.

Taken as a whole, the results reported here provide strong evidence that the Aaronson Web site pages mislead a substantial number of consumers regarding the services offered by Aaronson, communicate disparaging information to a substantial number of consumers, and will cause a substantial number of consumers to take action based on such misleading and disparaging information.

(*Id.* at 30–32.)

Defendants challenge the design and results of the Stewart Survey Report to support their argument that Diamond cannot prove this element.[10] (Doc. 115, pp. 13–17.) First, Defendants argue, without support, that the relevant population Dr. Stewart should have surveyed is "timeshare owners *who want to get out of their timeshares*" rather than the population he defined as "adult consumers (age 18 years or more) in the United States who own or have ever owned a timeshare property."[11] (*See* Doc. 115, p. 14; *see also* Doc. 115-13, p. 8.) Yet viewing of the Subject Advertisements and Firm Website is not limited to those who already want to get out of their timeshares. Rather, they appear on the internet—accessible by almost anyone. And, according to Dr. Stewart, the Subject Advertisements tell their viewers how to cancel their Timeshare Contracts when they may not have otherwise known they could or when they did not currently desire to get out of their timeshares. (*See* Doc. 133-19, ¶¶ 6, 7.) So because access to the Subject Advertisements and Firm Website is not limited to Defendants' suggested survey audience, the Court finds no reason to discredit the Stewart Survey Report based on the population used.[12]

---

[10] Defendants did not file a *Daubert* motion to exclude the Stewart Survey Report, despite that they now contend that issues with it warrant the Court disregarding it. They also have not introduced their own consumer behavior expert.

[11] The only support proffered by Defendants for this assertion is that "Mr. Aaronson certainly does not cater to people in the market looking to buy *more* timeshares." (Doc. 115, p. 14.) But neither the Subject Advertisements, the Firm Website, nor Defendants' intake questionnaire screen for purposes of future intent about timeshare purchasing. (*See* Doc. 135-1.)

[12] Dr. Stewart also asserts that "the population definition employed in the survey is consistent with the definition that would necessarily be used for media scheduling purposes by an advertiser." (Doc. 133-19, ¶ 8.) Defendants have offered nothing to counter this basis for the relevant population Dr. Stewart used for his surveys.

Second, Defendants challenge the Stewart Survey Report's conclusions about deception because none of the deception rates for relevant questions exceeded Defendants' 20% threshold for deception. (Doc. 115, pp. 14–17.) In support, Defendants pick out the questions they find relevant and assert that the deception rates evinced by the results from those questions are 11%, 14%, 6%, 8%, 4%, 1%, 12%, and 0%—"after netting out the 'noise.'"[13] (*Id.* at 15.) Defendants then conclude that the Stewart Survey Report shows a lack of deception from the Subject Advertisements. (*Id.* at 15–17.) But this attack twice fails.

First, while Defendants cite several non-binding cases for the proposition that 20% is the threshold deception rate sufficient to show deception (*see id.* at 13–15), Defendants ignore many cases finding percentages less than 20% sufficient, significant, and meaningful. *See, e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 594 (3d Cir. 2002) (citing cases finding that 7.5%, 9–10%, and 15–20% deception rates were sufficient and significant for evidence of confusion). Defendants' conclusions about the deception rates from the Stewart Survey Report contradict the conclusions reached by Dr. Stewart—the only consumer behavior expert here. (*See* Docs. 115-13, 133-19.) According to Dr. Stewart, the results to some questions referenced by Defendants were less than 20% but still "statistically significant," and Defendants improperly calculated results to others that actually exceed 20%. (*See* Doc.

---

[13] By "netting out the noise," Defendants mean that their deception rates were calculated by subtracting the control group percentages from the test group percentages. (*See* Doc. 115, p. 14 n.10.) But according to Dr. Stewart, this is only appropriate for certain questions. (Doc. 133, p. 24; Doc. 113-19, ¶¶ 9–11.)

115-13, pp. 27–30; Doc. 133-19, ¶¶ 9–11.) Given Dr. Stewart's calculations and conclusions, the Court is unpersuaded by Defendants' interpretation of the survey results—particularly with no expert for Defendants to opine on the accuracy and significance of the Stewart Survey Report.[14]

Ultimately, while Defendants' challenges may be fodder for attacking Dr. Stewart's calculations or his conclusions about the significance of the results, the Court finds that Diamond has presented sufficient evidence of deception so summary judgment cannot be granted.[15]

### 4. Material Effect

Next up is the third enumerated element: that the advertisements had a material effect on consumers' purchasing decisions. "To succeed on a claim of false advertising, the plaintiff must establish that 'the defendant's deception is likely to influence the purchasing decision.'" *Johnson & Johnson*, 299 F.3d at 1250 (quoting *Cashmere & Camel Hair*

---

[14] Defendants raise two other attacks on the Stewart Survey Report in their Motion: (1) Diamond failed to produce the respondents' own words to the open-ended questions, so Defendants cannot verify Dr. Stewart's results; and (2) Questions 5 is leading, which "taint[s] the probative value of [Question] 5a." (Doc. 115, pp. 16–17.) But Diamond says that it produced the raw data to the open-ended questions on September 30, 2018, and that Question 5 is not leading. (Doc. 133, pp. 24–25; *see also* Doc. 133-19, ¶ 12 (Dr. Stewart's declaration stating that Question 5 is not leading).) So the Court finds that these challenges also fail to change the Court's view that the Stewart Survey Report suffices to preclude summary judgment.

[15] Moreover, because evidence of deception is only required when the statements at issue are literally true but misleading, *see Osmose*, 612 F.3d at 1319, any flaws in the Stewart Survey Report would not entitle Defendants to summary judgment on the false advertisement claim at this stage because a reasonable jury could still find that the Subject Advertisements are literally false, eliminating the need for Diamond to present evidence of deception. *See supra* Subsection III.A.2; *see also Osmose*, 612 F.3d at 1319.

*Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311 (1st Cir. 2002)). This element must be established even when a court finds that the advertisement is false. *Id.* And, "[a] plaintiff may establish this materiality requirement by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'" *Id.* (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)).

Defendants contend that the lack of direct evidence showing that any of Defendants' Diamond Clients stopped making payments to Diamond or initiated arbitrations against Diamond based solely on the Subject Advertisements precludes Diamond from establishing this element. (Doc. 115, pp. 17–19.) But this assertion overlooks the circumstantial evidence in the record that could show that the Subject Advertisements influenced the "purchasing decisions" of people exposed to them—so this element survives summary judgment. For example, Diamond's damages expert's report shows a breakdown of the temporal correlation between when Diamond members retained Defendants and when they stopped making payments owed under their Timeshare Contracts. (*See* Doc. 115-15, pp. 15, 48–65.) There is also evidence that many of Defendants' Diamond Clients found Defendants through the Firm Website—where the Subject Advertisements were found. (*See* Doc. 133-9.) So a reasonable jury could find that something in the Subject Advertisements influenced the decision to stop making payments or to pursue arbitration.

Evidence also exists that the Subject Advertisements misrepresented the quality of Diamond and other timeshare developers' services and the legality of their conduct in performing those services. There are genuine issues of material fact on the literal falsity

or misleading nature of the Subject Advertisements as they relate to these representations (and Defendants' ability to assist timeshare owners in cancelling their contracts). *See supra* Subsection III.A.2. The Stewart Survey Report also suggests that the Subject Advertisements "mislead a substantial number of consumers regarding the services offered by Aaronson, communicate disparaging information to a substantial number of consumers, and will cause a substantial number of consumers to take action based on such misleading and disparaging information." (Doc. 115-13, p. 32.) And to the extent a reasonable jury finds that the Subject Advertisements misrepresented the quality of Diamond's timeshares and business practices, they could find the materiality requirement satisfied. *See Johnson & Johnson*, 299 F.3d at 1250 (stating that materiality is shown "by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'" (quoting *Nat'l Basketball Ass'n*, 105 F.3d at 855)).

The Court finds that genuine issues of material fact exist so a reasonable jury could find that the Subject Advertisements deceived or are likely to deceive viewers of the Subject Advertisements and this deception influenced or is likely to influence their timeshare purchasing decisions. So Defendants' argument for this materiality requirement does not warrant summary judgment.

### 5. Causation

Last for the Lanham Act claim, the Court tackles whether the Subject Advertisements proximately caused Diamond's claimed damages. To establish that the defendant's misrepresentations caused the injury:

> the plaintiff must show: "(1) the . . . statements were false or misleading; (2) the statements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on the consumer's purchasing decision; (4) the misrepresented service affects interstate commerce; and (5) [the plaintiff] has been, or likely will be, injured as a result of the false or misleading statement."

*Duty Free Americas*, 797 F.3d at 1277 (alteration in original) (quoting *Sovereign Military Hospitaller Order*, 702 F.3d at 1294). And to prevail under the Lanham Act, the false advertisements must cause a plaintiff's injuries. *Lexmark Int'l*, 572 U.S. at 132. This means that a court must determine "whether the harm alleged has a sufficiently close connection to" the false advertisements. *Id.* at 133. Thus, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.*

For starters, because genuine issues of material fact exist over whether the Subject Advertisements are false or misleading, deceived or can deceive, and had any material effect on consumer's purchasing decision—in other words, whether a Lanham Act violation has occurred—it follows that the Court cannot decide at this stage whether a Lanham Act violation caused any of Diamond's claimed damages. Summary judgment is unwarranted on that basis alone.

Moreover, Defendants' contentions that none of the Subject Advertisements expressly direct viewers to stop making payments to Diamond or to initiate legal action and that no direct evidence exists that Defendants' Diamond Clients stopped payments or began arbitration proceedings based solely on the Subject Advertisements miss the

mark on causation.[16] (*See* Doc. 115, pp. 7–9.) While direct evidence is lacking, Diamond has competent circumstantial evidence to show that a reasonable jury could find that the Subject Advertisements proximately caused Diamond's alleged injuries.

First, the Subject Advertisements appear or have appeared on the Firm Website, and there is testimony from some of Defendants' Diamond Clients that they viewed the Firm Website and that, in at least two instances, they watched the videos. (*See* Doc. 115-19, pp. 56, 85–86; Doc. 115-20, pp. 52–55, 91–94; *see also, e.g.*, Doc. 115-22, pp. 12–13.) Second, Google Analytics of the Firm Website show that the Subject Advertisements were viewed thousands of times, revealing the widespread exposure to the Subject Advertisements. (*See* Doc. 133-7.) Third, for the near eighty client matters associated with Defendants' Diamond Clients who retained Defendants through the Firm Website (and were exposed to the Subject Advertisements), those Diamond Clients ceased paying Diamond within a thirty-day period before retaining Defendants for eleven matters and after retaining Defendants in another twenty matters.[17] (*See* Docs. 133-9–133-11; *see also*

---

[16] Defendants' argument on proximate causation also fails to address Diamond's assertions about reputational harm. To the extent the jury finds that the accusations in the Subject Advertisements harmed Diamond's reputation, there is no question about proximate causation. *See Lexmark Int'l*, 572 U.S. at 138 ("When a defendant harms a plaintiff's reputation by casting aspersions on its business, the plaintiff's injury flows directly from the audience's belief in the disparaging statements.") Moreover, if a jury determined that the Subject Advertisements contained known falsehoods, proximate causation could easily follow. *See id.* ("[A] defendant who 'seeks to promote his own interests by telling a known falsehood to *or about* the plaintiff or his product' may be said to have proximately caused the plaintiff's harm." (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008))).

[17] Diamond asserts that these percentages reveal that "nearly 40% of Defendants' Diamond clients generated by the website stopped paying Diamond just before or after hiring them." (Doc. 133, p. 27.)

Doc. 115-15.) Last, the Stewart Survey Report states that the Subject Advertisements are likely to cause viewers to hire Defendants and to stop making payments on their Timeshare Contracts. (*See* Doc. 115-13, pp. 30–32.) This demonstrates disputed facts exist for a jury to sort out on causation.

Beyond this, Defendants cite no authority to support their contention that false advertisements must expressly tell viewers to withhold trade from a plaintiff or that the false advertising must be the only reason behind a consumer's actions for a plaintiff to prevail on a false advertising claim. (*See* Doc. 115.) Courts have found that causation just requires that the false advertising proximately cause the claimed injury — it need not be the only cause or even the predominant cause of the injury. *See J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.*, No. CIV.A. 96-5819, 1997 WL 83766, at *5 (E.D. Pa. Feb. 19, 1997). Because Diamond has presented circumstantial evidence raising genuine issues of material fact on causation, particularly when viewed in terms of Diamond's best case, summary judgment cannot be granted.[18]

### B.     Counts II–IV: Florida Law Claims

Having found that the Lanham Act claim survives summary judgment, the Court turns to Diamond's three Florida law claims. Defendants seek summary judgment on two

---

[18] Lumped in with Defendants' causation argument is an assertion that Diamond must show that Diamond and Defendants are marketplace competitors under the commercial speech test espoused in *Tobinick v. Novella*, 848 F.3d 935, 950–51 (11th Cir. 2017), because Diamond has abandoned its claim for reputational damages. (Doc. 115, pp. 8–9.) But although Diamond is not seeking monetary damages for reputational harm, Diamond has maintained its allegation that it has suffered reputational harm. (*See* Doc. 133, pp. 15–16.) So nothing has changed since the Court rejected this argument in its order on Defendants' motion to dismiss. (Doc. 43, p. 6.)

grounds: (1) Florida's litigation privilege; and (2) Diamond's lack of evidence to satisfy each claim. (Doc. 115, pp. 19–24.) The Court addresses these.

### 1.      Florida's Litigation Privilege[19]

First is Defendants' claim of Florida's litigation privilege. Florida's litigation privilege provides absolute immunity to statements or acts: (1) made or committed in judicial or quasi-judicial proceedings; and (2) "connected with, or relevant or material to, the cause in hand or subject of inquiry." *DelMonico v. Traynor*, 116 So. 3d 1205, 1212 (Fla. 2013) (quoting *Myers v. Hodges*, 44 So. 357, 361 (1907)). "The mere existence of litigation 'does not attach the privilege to every communication . . . ; rather, the communication must be analyzed in light of its relation to the litigation.'" *Braxton Techs., LLC v. Ernandes*, No. 6:09-cv-804-Orl-28GJK, 2010 WL 11623673, at *4 (M.D. Fla. Apr. 22, 2010) (quoting *N. Star Capital Acquisitions, LLC v. Krig*, 611 F. Supp. 2d 1324, 1331 (M.D. Fla. 2009)). "Florida courts have been reluctant to endorse a wholesale extension of the litigation privilege to those communications that have some relation to subsequent litigation." *Id.*

From that, Florida courts have curbed extension of the litigation privilege to conduct "'in the course of judicial proceedings' so long as the conduct has 'some relation to or connection with the subject of inquiry'" and "to conduct that is 'necessarily preliminary' to judicial proceedings." *AGM Invs., LLC v. Bus. Law Grp., PA*, 219 So. 3d 920, 924 (Fla. 2d DCA 2017) (citations omitted); *see also Braxton Techs., LLC*, 2010 WL 11623673,

---

[19] Because advertising is not required by or even related to any arbitration proceedings, Florida's litigation privilege could only apply to Diamond's Florida law claims to the extent that they are based on Defendants' conduct while representing Diamond Clients. (*See* Doc. 43, pp. 15–16.)

at *4. Conduct that is "necessarily preliminary" to a judicial proceeding is limited to pre-suit communications that are a statutory or contractual condition precedent to suit. *See, e.g., Pledger v. Burnup & Sims, Inc.,* 432 So. 2d 1323, 1327 (Fla. 4th DCA 1983) (declining to extend absolute immunity to pre-litigation settlement efforts); *see also Trent v. Mortg. Elec. Registration Sys., Inc.,* 618 F.Supp.2d 1356, 1361 (M.D. Fla. 2007) (declining to extend the litigation privilege to pre-suit communications not required by law), *aff'd,* 288 F. App'x 571 (11th Cir. 2008).[20]

Defendants assert that Florida's litigation privilege bars Diamond's reliance on any statements or acts during earlier arbitration proceedings as support for Diamond's Florida law claims. (Doc. 115, pp. 19–20.) Although Defendants identified no specific acts or statements to which the privilege applies in their Motion, Defendants assert in their reply that the privilege applies to:

> Doc. 133-12 (Sandy Royce testimonial statements in a deposition attendant to an arbitration proceeding); Doc. 133-13 (Statement of Claim filed in arbitration proceedings); Doc. 133-14 (numerous arbitration awards); Doc. 133-16 (Diamond's Answer and Counter-Statement of Claim in Hardisty arbitration proceeding); Doc. 133-17 (Motion for Leave to Withdraw as Counsel in Hardisty arbitration proceeding); Doc. 133-18 (Sorenson arbitration award); Doc. 133-20 (transcript for Kay Gutierrez arbitration hearing); Doc. 133-21 (transcript for Nancy Johnson arbitration hearing); Doc. 115-19 (deposition testimony in this lawsuit of Ms. Hardisty concerning statement[s] that are relevant to her representation by Mr. Aaronson and that were made in connection with her arbitration proceeding, specifically statements relating to instructions regarding whether to continue payments to Diamond); Doc. 115-20 (deposition testimony in this lawsuit of Dr. Feldman concerning statement[s] that are relevant to his representation by Mr. Aaronson and that were made in

---

[20] While unpublished opinions are not binding precedent, they may be considered persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina,* 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

connection with his arbitration proceeding, specifically statements relating to instructions regarding whether to continue payments to Diamond); and any and all other statements or acts that were made or committed in the course of, or necessarily preliminary to, any prior Diamond arbitration proceeding and were connected with, or relevant or material to, the cause in hand or subject of inquiry.

(Doc. 138, pp. 10–11 (footnotes omitted).) On review, the Court finds that Defendants have not met their burden of establishing that the litigation privilege applies to all the acts and statements listed.[21]

Defendants' assertion of the litigation privilege faces two problems at this stage of the proceedings. The first is a procedural error. Defendants' Motion was silent on the statements or acts they claim are protected by the litigation privilege (*see* Doc. 115, pp. 19–20), so Defendants tried to supply that information for first time in their reply (*see* Doc. 138, pp. 10–11).[22] But new facts presented for the first time in a reply fail to provide a proper basis upon which to grant the Motion. *See Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1293 (S.D. Fla. 2015) ("It is well established that a party cannot for the first time in a reply memorandum . . . assert new factual arguments to support a summary judgment motion."). And because Defendants failed to argue the application of the litigation privilege to specific statements and acts in their Motion (thereby providing

---

[21] Florida's litigation privilege is an affirmative defense. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir. 2004) (citing *Am. Nat'l Title & Escrow of Fla., Inc. v. Guarantee Title & Trust Co.*, 810 So. 2d 996, 998 (Fla. 2d DCA 2002)). So Defendants bear the burden of proving its applicability.

[22] This goes against the purpose of a reply brief. *See Tardif v. People for the Ethical Treatment of Animals*, No. 2:09-cv-537-FtM-29SPC, 2011 WL 2729145, at *2 (M.D. Fla. July 13, 2011) ("The purpose of a reply brief is to rebut any new law or facts contained in the . . . response to a request for relief before the Court.").

Diamond the opportunity to rebut the application of the privilege), Defendants have failed to prove their entitlement to the privilege. So on that basis alone, Defendants are not entitled to summary judgment on their assertion of Florida's litigation privilege.

Second, had Defendants provided the list of statements and acts in their Motion, it is not clear that all the statements listed fall under the litigation privilege. While Defendants' statements made during arbitration proceedings and in documents filed as part of those arbitration proceedings fit within the privilege, there is a factual dispute on when Mr. Aaronson made statements to his clients about continuing payments to Diamond and whether those statements were necessarily preliminary to or sufficiently related to any arbitration proceedings. *See AGM Invs., LLC*, 219 So. 3d at 924; *see also Braxton Techs., LLC*, 2010 WL 11623673, at *2–4. Defendants' assertion that such statements "were made in connection with [an] arbitration proceeding" is not enough to determine whether Defendants may have absolute immunity for them. *See Braxton Techs., LLC*, 2010 WL 11623673, at *4 ("Florida courts have been reluctant to endorse a wholesale extension of the litigation privilege to those communications that have some relation to subsequent litigation."). The Court denies Defendants' wholesale adoption of Florida's litigation privilege on Diamond's Florida law claims premised on Defendants' conduct during representation. The availability of the privilege will need to be determined at trial on the specific circumstances of the statements.

### 2.      Count II: Tortious Interference with Contractual Relationship

Addressing the merits of the Florida law claims, the Court starts with Diamond's tortious interference claim. To establish a tortious interference claim under Florida law,

a plaintiff must show that (1) a contract exists; (2) the defendant knew about the contract; (3) the defendant intentionally procured a breach of the contract; (4) there is no justification or privilege for the breach; and (5) the plaintiff suffered damages from the breach. *Johns Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998) (citing *Fla. Tel. Corp. v. Essig*, 468 So. 2d 543, 544 (Fla. 5th DCA 1985)). And a plaintiff must allege that the defendant is a third-party—not a party to the contract or an agent of a contracting party. *Abruzzo v. Haller*, 603 So. 2d 1338, 1339–41 (Fla. 1st DCA 1992). "[A]n agent generally cannot be held liable for tortiously interfering with the contract of its principle because the agent is privileged to act in the best interest of the principle." *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1367–68 (M.D. Fla. 2007) (citing *Sloan v. Sax*, 505 So. 2d 526, 528 (Fla. 3d DCA 1987)).

"However, an agent's 'privilege to interfere' with the contracts of its principal is not absolute." *Westgate Resorts, Ltd. v. Castle Law Grp, P.C.*, No. 6:17-cv-1063-Orl-31DCI, 2017 WL 6512552, at *3 (M.D. Fla. Dec. 20, 2017) (citing *Sloan*, 505 So. 2d at 528). "The privilege is divested when the defendant acts solely with ulterior purposes and the advice is not in the principal's best interest." *Rudnick v. Sears, Roebuck & Co.*, 358 F. Supp. 2d 1201, 1206 (S.D. Fla. 2005) (quoting *O.E. Smith's Sons, Inc. v. George*, 545 So. 2d 298, 299 (1st DCA 1989)). But "[a] qualified privilege to interfere is not negated by concomitant evidence of malice. It is only when malice is the *sole* basis for interference that it will be actionable." *McCurdy v. Collis*, 508 So. 2d 380, 383 (Fla. 1st DCA 1987). "In other words, the party must be interfering *solely* out of spite, to do harm, or for some other bad motive." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n.9 (11th Cir. 2001) (citations omitted).

Diamond's tortious interference claim starts with the Subject Advertisements. (*See* Doc. 47, ¶ 72.) Defendants attack this by asserting that "[t]he advertising itself did not cause anyone to discontinue payments to Diamond." (Doc. 115, p. 21.) But, as discussed above, there are genuine issues of material fact about whether the Subject Advertisements caused Diamond members to stop paying Diamond. *See supra* Section III.A. Thus, the Court cannot grant summary judgment on the tortious interference claim to the extent that it turns on the Subject Advertisements.

Diamond also bases this claim on Mr. Aaronson's advice and instructions to his Diamond Clients to stop making payments to Diamond. (*See* Doc. 47, ¶ 73.) Mr. Aaronson admits that he advised at least one of his Diamond Clients to discontinue payments to Diamond: Ms. Hardisty. (Doc. 115, p. 21.) But there is also evidence that Mr. Aaronson advised at least one other couple to stop making payments: the Feldmans. (*See* Doc. 115-20, pp. 115–16, 124.) So the question that remains for the Court is whether this advice is privileged.

For the Hardistys, Defendants assert Mr. Aaronson was privileged to give this advice because: (1) he was acting as their agent; (2) it was honest; and (3) the advice was in their best interests given the Hardistys' financial situation. (Doc. 115, pp. 21–22.) But whether Mr. Aaronson's claim holds water is questionable because the Hardistys were then sued by Diamond for these delinquent payments—after which Mr. Aaronson withdrew from representing them. (*See* Doc. 133-16; *see also* Doc. 115-20, pp. 65, 138, 146.) And Mr. Aaronson gave this advice knowing that Diamond had successfully counter-claimed against some of his other Diamond Clients for delinquent payments. (*See* Doc.

133-14, pp. 1–16 (Gutierrez); *id.* at 18–38 (Feldmans); *id.* at 50–61 (Johnson)[23]; *see also* Doc. 115-20.) Mr. Aaronson also failed to explain his motivation behind the advice he gave the Feldmans about ceasing payments—in other words, he has not shown this advice was justified or privileged.[24]

The Court finds that genuine issues of fact exist about Mr. Aaronson's motivation to advise his Diamond Clients to cease paying Diamond. As his privilege claim hinges on these disputed facts, summary judgment cannot be granted on Diamond's tortious interference claim based on Mr. Aaronson's advice. *See McCurdy*, 508 So. 2d at 383 ("Where the circumstances surrounding the statement are in dispute, the question of qualified privilege is a factual determination for resolution by the jury.").

### 3. Count III: Trade Libel

Next, the Court addresses Diamond's trade libel claim. To establish a trade libel claim under Florida law, a plaintiff must show: (1) a falsehood; (2) that has been published or communicated to a third person; (3) when a defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with plaintiff; (4) the falsehood plays a material and substantial part in inducing others not to

---

[23] As discussed above, Defendants object to the arbitration awards as inadmissible hearsay. (*See* Doc. 138, p. 10 n.7.) But the Court disagrees. *See supra* note 8.

[24] Florida courts consider the privilege to interfere as an affirmative defense for claims of tortious interference with contractual relationships. *See Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1104 (S.D. Fla. 2000) (citing *Abele v. Sawyer*, 750 So. 2d 70, 75 (Fla. 4th DCA 1999)). As a result, "Florida courts have discussed this defense within a burden-shifting framework. That is, once a plaintiff has made a prima facie case of tortious interference with a business relationship, the burden shifts to the defendant to show that his interference was lawful." *Id.* (citations omitted).

deal with plaintiff; and (5) special damages proximately resulting from the published falsehood. *See Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006) (citations omitted).

Defendants challenge Diamond's trade libel claim based on a lack of evidence that the Subject Advertisements proximately caused Diamond's arbitration costs and fees and the unpaid timeshare promissory notes and other fees under the Timeshare Contracts. (Doc. 115, pp. 22–23.) Defendants contend that Mr. Aaronson's Diamond Clients had their own reasons for stopping payments and that too many intervening steps stand between the Subject Advertisements and the arbitrations to show that the Subject Advertisements proximately caused Diamond's damages. (*Id.*) Summary judgment on this claim is denied.

As Defendants' attack on Diamond's trade libel claim stands on the same evidence and argument about proximate causation that Defendants raised against Diamond's Lanham Act claim, it fails for the same reason. *See supra* Section III.A. Because genuine issues of material fact exist about whether the Subject Advertisements proximately caused Defendant's Diamond Clients to stop making payments and to pursue arbitration claims against Diamond, Defendants are not entitled to summary judgment on Diamond's trade libel claim.

### 4.    **Count IV: FDUTPA**

Finally, the Court addresses Diamond's FDUTPA claim. FDUTPA declares unlawful "unfair or deceptive acts or practices" committed "in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). A FDUTPA claim has three elements: "(1) a

deceptive act or unfair practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013) (citations omitted). "Under FDUTPA, 'actual damages' do not include consequential damages, precluding recovery of future lost profits." *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1294 (M.D. Fla. 2009) (citations omitted). But lost profits already suffered constitute "actual damages" for purposes of FDUTPA. *See Factory Direct Tires Inc. v. Cooper Tire & Rubber Co.*, No. 3:11-cv-255-RV/EMT, 2011 WL 13117118, at *7 (N.D. Fla. Oct. 24, 2011) ("[Plaintiff] is not seeking future lost profits, but rather the lost profits that it has already suffered. It would appear that such damages constitute 'actual damages' under FDUTPA.").

Defendants attack the FDUTPA claim by arguing that Diamond has suffered no "actual damages" and that causation is lacking. (Doc. 115, pp. 23–24.) But the Court finds that Diamond's FDUTPA claim survives. As for actual damages, Diamond has claimed damages based on the unpaid promissory notes, maintenance fees, and other timeshare fees that Defendants' Diamond Clients contracted to pay in exchange for timeshare ownership.[25] These are not the speculative damages or future lost profits precluded under FDUTPA. Instead, they are actual lost profits that Diamond has suffered, recoverable under FDUTPA. *See Factory Direct Tires Inc.*, 2011 WL 13117118, at *7. Regarding causation, the Court has repeatedly stated that genuine issues of material fact remain. *See supra* Section III.A; *see also supra* Subsections III.B.1–3.

---

[25] Diamond also asserts that it seeks injunctive relief for this FDUTPA claim. (Doc. 133, p. 30.)

Ultimately, "[t]he success of [a plaintiff's] . . . FDUTPA claim[ ] is tied to the federal Lanham Act claim[ ] for . . . false advertising." *See Sovereign Military Hospitaller Order*, 702 F.3d at 1276 (citing *Nat. Answers, Inc.*, 529 F.3d at 1333). As the Court could not grant Defendants' request for summary judgment on the false advertising claim, Defendants' request for summary judgment on the FDUTPA claim is likewise denied.[26]

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED**:

1.      Defendants' Motion for Summary Judgment (Doc. 115) is **DENIED.**

2.      This matter will go to trial on all Counts.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 5, 2019.



ROY B. DALTON JR.
United States District Judge

---

[26] Defendants' also asserted the following new arguments for the first time in their reply: (1) the Single Publication/Single Action Rule, which Defendants use to argue that "to the extent that any one of Diamond's Florida law claims fail, they all fail" (*see* Doc. 138, p. 11); and (2) "Mr. Aaronson is entitled to summary judgment on all the damages that have allegedly arisen from those individuals as to which Diamond has introduced no such evidence" (*see id.* at 15). But the Court has not considered these arguments as they are not properly before the Court. *See Grasso v. Grass*, 131 F. Supp. 3d 1303, 1309 (M.D. Fla. 2015) ("District Courts, including this one, ordinarily do not consider arguments raised for the first time on reply." (quoting *Allah El v. Avesta Homes*, No. 8:11-cv-2192-T-33TGW, 2012 WL 515912, at *3 (M.D. Fla. Feb. 16, 2012))); *see also United States v. Whitesell*, 314 F.3d 1251, 1256 (11th Cir. 2002) (noting that courts need not address issues raised for first time in reply brief).

Copies to:
Counsel of Record